Docket No. 80673–Agenda 1–March 2000.

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. WILLIE THOMPKINS, Appellant.

Opinion filed June 15, 2000.

JUSTICE BILANDIC delivered the opinion of the court:

This opinion supplements our earlier opinion of 
People v. Thompkins
, 181 Ill. 2d 1 (1998) (
Thompkins III
).

The defendant, Willie Thompkins, was convicted in the circuit court of Cook County of the 1980 murders of two individuals and sentenced to death. On direct appeal, this court affirmed defendant’s convictions and death sentence. 
People v. Thompkins
, 121 Ill. 2d 401 (1988) (
Thompkins I
).

On post-conviction review, this court ordered an evidentiary hearing on defendant’s claim that he was denied effective assistance of counsel at his sentencing hearing because his counsel failed to adequately investigate and present mitigating evidence. 
People v. Thompkins
, 161 Ill. 2d 148 (1994) (
Thompkins II
). The circuit court conducted the evidentiary hearing and concluded that defendant was not denied effective assistance of counsel at sentencing. Defendant appealed directly to this court. 134 Ill. 2d Rs. 603, 651(a). Defendant argued that the circuit court erred during the evidentiary hearing by refusing to allow defendant to make several offers of proof, by leaving the bench during another offer of proof, and by ordering defendant’s offers of proof to be stricken from the record. 
Thompkins III
, 181 Ill. 2d at 9. We held that this combination of events resulted in clear and serious error. 
Thompkins III
, 181 Ill. 2d at 11-13. Accordingly, we ordered that the evidentiary hearing be reopened and retained jurisdiction over the cause. 
Thompkins III
, 181 Ill. 2d at 23-24.

On remand, the circuit court reopened the evidentiary hearing as directed. A record of that proceeding has been filed with this court. Supplemental briefs have been filed, and additional oral argument has been heard. For the reasons that follow, we now conclude that defendant received ineffective assistance of counsel at his sentencing hearing. Consequently, we vacate defendant’s death sentence and remand for a new sentencing hearing.

FACTS

This court’s prior opinions detail the evidence presented against defendant at his trial. We reiterate that evidence here only briefly and as necessary to resolve the ineffective-assistance-of-counsel issue before us. On December 23, 1980, the bodies of Gerald Holton and Arthur Sheppard were found lying outside in an unincorporated area near Markham, Illinois. Both men died from gunshot wounds to the head. The evidence disclosed that, on December 22, 1980, defendant’s sister-in-law, Pamela Thompkins, arranged to purchase some cocaine from the victims. The victims brought cocaine to Pamela’s home and placed it on a table in the basement, where Ronnie Moore and Sandra Douglas were seated. Defendant appeared with a gun and told the victims, “Put *** your hands on the table. This is the police.” Defendant and Moore then bound the victims with telephone cord. According to Douglas, some hours later while she and Pamela were upstairs in the home, she heard gunshots in the basement. She then saw a body being dragged to the garage, and saw Moore escort Sheppard outside. Defendant later called Douglas and instructed her to clean up the basement, which was bloody. Upon his arrest, defendant gave an oral statement to police in which he admitted his participation in the murders, but attempted to shift the blame to Moore.

Following a jury trial, defendant was found guilty of the two murders and several other offenses. The jury returned its verdict on June 8, 1982.

I. The 1982 Sentencing Hearing

After defendant’s conviction, the State asked the circuit court to convene defendant’s capital sentencing hearing immediately. Defense counsel requested the circuit court to order a presentence investigation. The circuit court refused defense counsel’s request, stating that a presentence investigation is not required in a capital case. Some discussion was then held concerning whether defendant would waive his right to a jury for sentencing.

The next morning, on June 9, 1982, the circuit court accepted defendant’s jury waiver for sentencing. The sentencing hearing then commenced.

Defendant was found eligible for the death penalty under the multiple-murder eligibility factor. Ill. Rev. Stat. 1979, ch. 38, par. 9–1(b)(3). His eligibility is not at issue in this appeal.

The sentencing judge heard evidence relevant to aggravation and mitigation. The State presented three items of aggravating evidence. In 1971, defendant was convicted of attempted murder and aggravated battery for shooting a man named Michael Weaver. The evidence in that case revealed that, in late 1970, defendant and some other men spoke with Weaver about whether he would remain a member of the Black P. Stone Nation street gang. The men accused Weaver of informing the Markham police department about gang activities. Ultimately, defendant and the men escorted Weaver to “an area of 161st and Gauger.” There, defendant kissed Weaver on both cheeks and then shot him three or four times and left him for dead. Weaver survived the shooting, but was left permanently paralyzed below the waist. Certified records showed that defendant was sentenced to 15 to 20 years in prison for shooting Weaver, and was released from prison and placed on parole on June 30, 1975.

The second item of aggravating evidence concerned an arrest. Shortly before his arrest in 1981 for the Holton and Sheppard murders, defendant was arrested for possession of a stolen motor vehicle and possession of a loaded firearm. The arresting officer testified that he stopped defendant while defendant was driving a stolen car. He found a loaded firearm on the car’s backseat and a sawed-off shotgun in its trunk. Defendant’s license plates were on the car, and the car’s vehicle identification number had been replaced with a fraudulent number.

Lastly, the State presented a statement by Pamela Thompkins in which she gave further details about the Holton and Sheppard murders. According to the statement, while defendant was in the basement of her home with the victims, Pamela heard him say something like “lay down, get down on the floor, this is it.” She also heard gunshots and then later saw blood on defendant’s clothing and shoes. She subsequently witnessed defendant pull Holton’s body out of a car trunk and dump it in a ditch. Pamela temporarily recanted this statement, following her own trial.

Defendant’s case in mitigation consisted of four stipulations and the brief testimony of defendant’s wife. The four stipulations concerned the possible origins of bullets used to kill Holton and Sheppard. Annetta Humphries would testify that, at 2:30 p.m. on December 22, 1980, she gave Holton a .357 revolver. She never saw Holton again. Linda Novelli would testify that, on November 8, 1979, she witnessed Holton purchase two .357 revolvers with certain serial numbers from a gun shop. On December 31, 1980, Novelli gave the revolver with one of those serial numbers to police. The police officer who received the revolver from Novelli would testify that he gave it to the Illinois State Police Crime Lab. A forensic scientist would testify that he examined the People’s exhibits 49 and 50, which consisted of spent projectiles, a bullet core, and lead fragments, and determined that they could have been fired from the revolver that Holton had purchased and which Novelli later gave to police.

Barbara Thompkins, defendant’s wife, testified in mitigation as follows. She married defendant on January 31, 1976. Defendant had two daughters from a previous relationship. Barbara and defendant had three children together, Tiffany, Willie, and Marshon. She and defendant owned a home together in Markham. After defendant’s release from prison in 1975, defendant was employed as a nurse’s assistant at the Rehabilitation Institute in Chicago. Defendant attended evening classes so that he could work in respiratory therapy. Defendant left his job at the Rehabilitation Institute in 1976. The next day he started work as a paramedic at the Cook County Department of Corrections. He worked there full-time until the fall of 1980. In July of 1980, defendant became ill with sarcodosis, a rare respiratory disease. As a result of his illness, defendant was hospitalized for six days and left his job as a paramedic. Defendant then worked periodically for his father doing construction work. From March 1981 through December 1981, defendant was in jail awaiting trial for these offenses. He was scheduled to start a new job for the City of Chicago rehabilitating gang members on June 1, 1982. Barbara’s entire direct testimony took up fewer than eight pages of transcript. This concluded defendant’s case in mitigation.

The next day, on June 10, 1982, the circuit court on its own motion ordered a presentence investigation to be conducted. The hearing was continued until July 1, 1982.

When the sentencing hearing was reconvened on July 1, 1982, the circuit court acknowledged receipt of a presentence investigation report and tendered copies to defense counsel and the State. The four-page report contained the following information about defendant: he was born on October 20, 1949; he attended three years of high school and completed his general equivalency diploma in 1972; he was enlisted in the army in 1967; he was currently unemployed but had worked as a paramedic and medical assistant in the past; he was married with four children; he lived in Markham in his own home; he was a Jehovah’s Witness; he enjoyed family sports; he suffered from a rare lung disease; he was of sound mind and had no problems with alcohol or drugs; and he had a good childhood. The report also reiterated defendant’s criminal background.

Also on July 1, 1982, defense counsel submitted over 50 personal letters to the circuit court on defendant’s behalf in mitigation. Many of the letter writers were friends and fellow church members of defendant’s parents. They described defendant as a good family man who was raised in a good, loving home and asked the circuit court to spare his life. Other letter writers included some of defendant’s aunts, in-laws, neighbors, and friends. They described defendant as respectful and helpful, and as a loving family man. Many of the foregoing letter writers acknowledged, however, that they did not know defendant well or had lost touch with him since his childhood. One letter writer, Emitt R. Jordan, had been incarcerated with defendant as an adult. He described defendant as a decent person with “much concern about the welfare of others”; as being dedicated to his prison job in the tuberculosis hospital; as coming from a good home and family; and as a person who is dedicated to his own family and a great asset to them.

Closing arguments ensued. Defense counsel argued that defendant should not be sentenced to death for the two homicides because the State had presented no evidence at trial that defendant actually fired the shots which killed the two victims. Defense counsel pointed out that defendant claimed in his statement to police that his codefendant, Ronnie Moore, actually fired those shots. Next, defense counsel briefly asked the circuit court not to dismiss the letters submitted on defendant’s behalf. Finally, defense counsel made a plea for life imprisonment.

After considering the evidence before it, the circuit court found no mitigating factor sufficient to preclude the death penalty and sentenced defendant to death. In his ruling, the circuit judge acknowledged that he had read and considered all the letters submitted on defendant’s behalf. He found the letter written by Jordan to be the most relevant. The circuit judge noted that many of the letter writers were writing “in respect to the defendant’s parents” and did not appear to know defendant well.

II. The Appeal in 
Thompkins II

On appeal from the dismissal of his post-conviction petition, defendant argued that he was denied effective assistance of counsel at sentencing because his counsel failed to adequately investigate and present mitigating evidence. 
Thompkins II
, 161 Ill. 2d at 165-68. Defendant had attached the affidavits of his parents, siblings, children, and friends to his post-conviction petition in support. This court reviewed those affidavits and concluded that they consisted of new evidence and that they were not duplicative of the letters submitted at the sentencing hearing. 
Thompkins II
, 161 Ill. 2d at 166. After reviewing the affidavits, this court was “not sure” whether actual testimony from those individuals who knew defendant well “would not have provided the sentencing judge with a more complete portrayal of the defendant.” 
Thompkins II
, 161 Ill. 2d at 167. Consequently, we ordered the circuit court to conduct an evidentiary hearing to determine whether defense counsel was ineffective for failing to investigate and present such testimony. 
Thompkins II
, 161 Ill. 2d at 167-68, 199.

The State contended in that appeal that defense counsel’s strategy at the sentencing hearing was to argue that the State’s evidence depicting defendant as the gunman was not so convincing that the death penalty was warranted. We stated in response:

“But the mitigating evidence now being proposed by the defendant would have complemented counsel’s strategy. Favorable testimony by the defendant’s family members would have fortified counsel’s contention that the evidence of the defendant’s role in the offenses was subject to doubt and did not justify sentencing the defendant to death.” 
Thompkins II
, 161 Ill. 2d at 167.

We therefore determined that defense counsel’s strategy of arguing that defendant did not actually kill the victims would not excuse a failure to present other mitigating evidence.

III. The 1995 Evidentiary Hearing

The circuit court conducted the evidentiary hearing in December of 1995. Defendant presented the testimony of his trial counsel, several mitigation witnesses, and an investigator. Defendant also testified on his own behalf. In addition, defendant tendered other testimony that the circuit court excluded from consideration.

A. 
Defense Counsel

The same attorney represented defendant at trial and sentencing. Defense counsel was an attorney in private practice, but the circuit court appointed him to represent defendant. Counsel testified that he began representing defendant for the Holton and Sheppard murders in July of 1981, approximately one year before defendant’s trial began. Because defendant was charged with a double homicide, counsel knew from the start that the State might seek the death penalty. He learned that the State would seek the death penalty just before trial.

Counsel averred that he met with defendant in preparation for defendant’s sentencing hearing, but could not recall the number of occasions. He met with defendant in the courthouse anteroom and in jail; however, he never met with defendant in his office “specifically concerning the sentencing hearing.” When counsel met with defendant in his office prior to defendant’s trial, they discussed the possible penalties that defendant could receive. Counsel also asked defendant general questions about his background:

“I asked him about himself. Who he was. What he was about. I asked him about his family. General information. I asked him about his background. If he had any criminal background, things of that nature.”

A colloquy then followed between defendant’s post-conviction counsel and his trial counsel:

“Q. What did you tell Mr. Thompkins with respect to what type of evidence you intended to present at the capital sentencing hearing?

A. Well, I advised him more of his options to find out what he wanted me to do as opposed to me telling him what to do. It was his case. It was not my case.

Q. Did you tell Mr. Thompkins that you would be performing any investigation for purposes of preparing for the capital sentencing hearing when you met with him?

A. I told him it would be important to look at certain things. That was prior to the decision. Well, yes, I did. I told him that there were certain things that should be investigated.

Q. What were the things that you told Mr. Thompkins should be investigated?

A. Basically, who he was, and what he was.

Q. Did you suggest to Mr. Thompkins any specific avenues to uncover that information?

A. Not that I recall, no.”

Counsel admitted that, although he asked defendant about his background, he never asked defendant to provide him with the names of persons who could help him prepare for the sentencing hearing.

Counsel could not recall how much time he had spent preparing for defendant’s sentencing hearing, conducted 12 years earlier. When asked if he met with any members of defendant’s family to prepare for the sentencing hearing, counsel responded that he met once with defendant’s wife, but could not recall for how long. He also spoke with defendant’s parents “but, in the sense of having an actual meeting [with them], I would not define it as an actual meeting.” Counsel had no memory of meeting with any of defendant’s four brothers or any of defendant’s five children. He had no memory of defendant’s daughters from outside his marriage. He never spoke with defendant’s aunt, Margaret Haskell.

Counsel did not call defendant’s parents to testify at sentencing because he did not believe that their testimony would have any impact on the case. He based this decision on the fact that defendant had opted for sentencing by the judge, rather than the jury. He admitted, however, that he did not know that defendant would waive the jury until, at the earliest, the night before the sentencing hearing began. Counsel did not call any other family members to testify at sentencing because he did not believe that their testimony would have any impact on the case and because he was not aware that some of them existed.

Counsel called defendant’s wife to testify because he felt that she was “best able” to convey to the judge that defendant was a hard-working person who supported his family and “that the only reason he was out of work was because he had gotten ill.” He admitted, however, that he was wary of “overplay[ing] the husband-wife relationship” because Sandra Douglas testified at trial that she had been dating defendant.

Counsel never met with any of defendant’s supervisors or coworkers regarding the sentencing hearing. He never met with any of defendant’s friends. He never sought to obtain any records concerning defendant’s education, employment, military service or prison incarceration.

Counsel asked defendant’s mother to collect letters on defendant’s behalf and told her “what kinds of letters would be of interest.” He did not participate in collecting the letters, and he made no effort to speak to the letter writers himself to see if they could testify. After receiving the letters from defendant’s mother, he reviewed them and submitted them to the court.

On cross-examination, the State questioned counsel about his trial preparations. Counsel explained that, before trial, defendant took “little interest in the proceedings.” Based on defendant’s comments, counsel thought that defendant believed his case would never go to trial. Defendant appeared only sporadically for their appointments. Shortly before trial, defendant appeared at counsel’s office and asked him to seek a continuance. Defendant told him that if he could find Sandra Douglas, who was scheduled to testify against him, then there would be no trial. Counsel refused to seek a continuance and from “that point on, there was a bit of enmity between the two of us.” Shortly thereafter, defendant fired counsel and hired another attorney, who sought a continuance on defendant’s behalf. The circuit court refused to give the new attorney a continuance. Defendant then rehired counsel. Counsel prepared the case for defendant. At that point, their relationship was “a bit distant.”

Counsel advised defendant that the sentencing judge had never given the death penalty to anyone. Counsel believed that the judge would base his decision on the facts of defendant’s case and his criminal background. Counsel was concerned about defendant’s prior conviction because, in that case, defendant himself clearly fired the shots into the victim. Counsel testified,“[I] believed that since it was not clear in the record at all that Mr. Thompkins had killed anyone himself, that that would be the deciding factor.”

Counsel explained defendant’s right of allocution to him, and advised him to take advantage of this right. Defendant disregarded this advice.

B. 
Witnesses in Mitigation

Defendant’s mitigation witnesses at the evidentiary hearing included a former chief of police, several family members and friends, a church bishop, and two physicians who had supervised defendant’s work. All of the witnesses stated that they were available and would have been willing to testify at defendant’s sentencing hearing had they been asked, but that defense counsel never contacted them. In addition, Barbara Thompkins testified for the second time.

i. Former Chief of Police

Robert Forberg testified that he has been the corporate purchasing manager at Arco Fasteners since 1981. From 1961 through 1974, Forberg was employed by the Markham police department. He started there as a patrol officer. In 1962, he was promoted to the position of youth officer. Forberg’s responsibilities as a youth officer included investigating and processing all juvenile offenders. He also served on several youth community organizations. In 1966, Forberg was made chief of detectives and, in 1968, the chief of police.

Forberg first met defendant when defendant was about 14 years old. Forberg investigated defendant for minor crimes that he committed as a juvenile, such as shoplifting, bicycle theft, and curfew violation. As a result, they developed a relationship. Forberg lost touch with defendant when he was about 17 years old.

In the summer of 1966 or 1967, Forberg chaperoned a youth program at a roller skating rink in Harvey. Several small fights began. During the commotion, a young man whom Forberg had arrested several times came out of the crowd and struck Forberg on the head with a bottle. Forberg fell to the ground. The offender was attempting to get Forberg’s service revolver, when defendant and another youth jumped on top of Forberg. Forberg believed that defendant acted “out of loyalty to protect [him].” He credited defendant with saving his life.

Defendant aided Forberg’s police work in other ways. Forberg explained that, in the 1960s, there was turmoil in many communities and gangs were forming. According to Forberg:

“Harvey already had the Black Stone Rangers, Phoenix, Dixmore. [Defendant] was basically the leader of the Markham group, and through some of the conversations that we’ve had *** we prevented a lot of trouble within the village of Markham.”

In particular, Forberg described an occurrence where approximately 200 youths gathered at Rosner Park:

“[H]alf were white, half were black. And there was going to be a turf war between the whites and the blacks, and there was a white leader *** [who] assisted me in calming the whites down, and [defendant] helped me with the black youths.

And through their efforts, there was no confrontation at all.”

Forberg opined that, had confrontation erupted, lives would have been lost because the youths were carrying baseball bats, clubs, and chains.

Defendant also assisted Forberg in organizing a basketball program for area youths. Defendant promoted it throughout the community and brought in “a lot of the troublemakers” who “we felt were destined to go down the road in the wrong way.” On Thanksgiving, defendant worked with a local businessman and delivered food to poor families. During the Christmas season, defendant donated his time to repair broken toys to give to needy children.

On cross-examination, Forberg clarified that defendant had been the leader of the Kingston Green Black Stone Rangers, a street gang. Forberg was not aware of defendant’s conviction for shooting Michael Weaver in 1970.

ii. Family Members

Defendant’s mother, Essie Thompkins, testified that defendant is her eldest of five sons, products of a 48-year marriage. She described defendant as a respectful boy, who helped out at home with the chores, did well in school, was active in their church, and enjoyed a variety of outside activities such as sports and Cub Scouts. At some point, defendant served as a deacon and treasurer of their church and sang with the gospel choir.

Essie knew about defendant’s conviction for shooting Michael Weaver. She had been very hurt by it because she considered Weaver, a neighborhood boy, to be like a son to her. After the shooting, Essie spoke with Weaver’s mother, offering her sympathy, unaware that her own son had caused the harm.

Essie thought that defendant had learned from his prison experience because he became involved with a religious group and went to school to become a medical technician. While he was working as a medical technician, defendant lived next door to his parents and Essie saw him often. She described defendant’s relationship with his wife and children as “nice.” Defendant would spend time with his children and his “discipline to them was good.”

Essie never met with defendant’s defense counsel prior to trial. During the trial, she met his defense counsel in the courthouse lobby, where they would have short conversations. Defense counsel never asked her to testify at defendant’s sentencing hearing. Essie collected the letters submitted at the sentencing hearing. Defense counsel informed her of the submission deadline, but did not tell her what type of information should be in the letters or help her collect them. She therefore collected letters from people who knew both her and defendant.

Defendant’s father, Willie Thompkins, Sr., testified that defendant was a kind and loving son to him and his wife. They had no problems with defendant and depended upon him to take care of his younger brothers. After defendant was released from prison for the Weaver shooting, he worked for his father doing concrete work. Defendant was “a very good worker.” At some point after his release, defendant moved into the house next door with his wife and family. Willie Sr. saw defendant often and found him to be a nice husband and a good family man. Defendant loved his children and had a lot of patience with them. On cross-examination, Willie Sr. acknowledged that defendant had taken a “different path” than he with his life.

Defendant’s former wife, Barbara Thompkins, testified that she was no longer married to defendant at the time of the evidentiary hearing. Barbara clarified that when she married defendant in 1976, she already had one daughter, Tiffany. She and defendant then had two sons together. She described defendant as an excellent father and good provider, who treated her daughter as his own. Defendant was a “good husband, very understanding, very patient, very loving.” He helped with the cooking, cleaning, and child-rearing. When she first met defendant, he was a practicing Jehovah’s Witness and taught Barbara and others about the Bible. Despite the murders, she thinks defendant is a good person who does not deserve the death penalty.

Defendant’s brother, Berwyn Thompkins, testified that the Thompkins family is close. As children, the five brothers spent a lot of time in church because their parents are religious. Defendant was a nice brother who taught his younger brothers how to play sports. Berwyn remained close to defendant when they became adults. He described defendant’s relationship with his own family as nice and loving. Despite defendant’s crimes, Berwyn believed that defendant has a substantial amount of good in him and a lot to offer the community.

Gia Mack and Robin Johnson are defendant’s daughters by Joyce Mack, a woman with whom defendant lived for a time but never married. Gia testified that after she turned age six, she saw defendant several times a week. The family was close even though defendant was then married to Barbara Thompkins.

Robin testified that she was born in 1970. As a young child, her father was in prison. Upon defendant’s release from prison, he lived with Joyce Mack and the girls for awhile. Later, when Robin was age 12, she lived with defendant and Barbara Thompkins. Robin described her “extremely close” relationship with her father. Even when they did not live in the same household, they did many things together. The time she spent with her father was important to her. Robin “looked up” to her father because he taught her the importance of education and family, and values such as patience and responsibility. He always explained to Robin why he was disciplining her. Her father is her “best friend” and they “talk about everything.”

Defendant’s aunt, Margaret Haskell, who had written one of the letters submitted at the sentencing hearing, testified that she has known defendant since he was two years old. As a child, defendant was well-behaved and respectful to his parents and others. Defendant acted the same “in her presence” when he reached adulthood.

iii. Friends

John Chamberlain testified that he was defendant’s close friend as a teenager. Their parents knew each other and they all attended church together every Sunday. He described defendant as a “lively guy” to whom he could tell his problems. Also, defendant was respectful to both their parents, as he was “brought up right.” In the late 1960s, Chamberlain joined the military. When he returned from service, he saw defendant on a few occasions throughout the late 1970s and early 1980s. Defendant appeared to be the same person Chamberlain always knew, and he “loved his kids.”

Belinda Jackson testified that she was defendant’s friend during their early teenage years. Defendant was like a big brother to her. He protected her on one occasion when another guy was about to “get physical” with her. She moved away from the area and lost touch with defendant until 1978 or 1979. When she returned, defendant was married and Jackson socialized with him and his wife. Defendant was helpful to her, driving her to and from the train station while her car underwent repairs. He also paid off a loan for her when she was in financial trouble. Defendant was very involved with his children.

Perrena Madgett testified that she grew up with defendant and saw him daily. As an adult from 1968 through 1970, she and her husband regularly socialized with defendant and his wife. Defendant was always kind, compassionate, and friendly. Later, when Perrena was undergoing a divorce, defendant was the only friend who supported her. Defendant was respectful and a good father.

Clarencetta Thomas also grew up with defendant and saw him almost daily throughout their childhood and teenage years. Defendant was warm and kind. He was protective of the neighborhood girls; he escorted them home and talked to them about their problems. When Thomas became pregnant in high school, defendant was supportive and visited her often, even though most people shunned her. Thomas left Markham in 1970 or 1971. When she returned in 1972 or 1973, she occasionally saw defendant. She still found him to be kind, loving, and giving.

iv. Fellow Inmate

Emitt R. Jordan, who wrote the most relevant letter to the court in 1982, testified that he was incarcerated with defendant at Pontiac prison in the early 1970s, though he did not know why defendant was there. Jordan had been sentenced in 1963 to a 45- to 60-year prison term for murder and armed robbery. Defendant worked in the prison tuberculosis hospital. Jordan considered defendant a friend. He talked to defendant about everything, including defendant’s desire to get out of prison, get a job in a hospital, and take care of his family. Jordan thought of defendant as a “solid and upstanding” person, not an agitator. Defendant even broke up some fights at Pontiac. After both men were released, Jordan saw defendant a few times, but not between 1976 and 1982.

v. Church Bishop

Bishop Howard Hogan testified that he has been a bishop in the United Pentecostal Churches of Christ in Chicago for about 10 years. He wrote a letter submitted at the sentencing hearing. Hogan met defendant in 1975 or 1976 after graduating from the seminary and becoming the pastor of defendant’s parents’ congregation. Defendant’s parents invited Hogan to their home for dinner at least once a week, where Hogan would often see and converse with defendant. They mainly spoke about defendant’s interest in paramedics, but discussed religious matters and other topics as well. Hogan found defendant to be extremely respectful, intelligent, and loving and devoted to his wife and children. He often observed defendant playing with his children and sharing conversations with his wife and others.

On cross-examination, Hogan stated that he never saw defendant in church. He knew defendant well enough to testify on his behalf, but not well enough to say what defendant did outside his presence. Hogan learned in time about the Weaver shooting, but his opinion of defendant remained unchanged because he did not know anything about defendant’s “other side.”

vi. Physicians Who Supervised Defendant’s Work

Dr. George Geis testified that he supervised defendant’s work as a paramedic at the Cook County jail from about 1974 to 1977. Defendant’s responsibilities there entailed distributing medicine and evaluating inmates’ medical complaints to determine which required a physician’s attention. Defendant performed his job duties “very well” and was reliable. The quality that most impressed Dr. Geis was that defendant performed his duties “with an unusual degree of insight,” “calm,” and “decorum,” which was unusual in that milieu of general chaos, noise, and confusion.

Dr. Geis recalled a conversation he had with defendant concerning some of his criminal background. Dr. Geis was impressed by defendant’s strength of character in taking responsibility for his past behavior. If he had been called to testify at defendant’s sentencing hearing, he would have described defendant’s crimes “as failings that weren’t characteristic of the person that I knew” and “transgressions that don’t really, truly reflect the core of the person that I knew.”

Dr. Lambert King testified that he knew defendant between 1974 and 1977 when Dr. King was the medical director at Cermack Hospital and the Cook County jail. Defendant was employed as a medical corpsman, and Dr. King regularly interacted with him. Defendant’s duties included screening inmates for health problems and physician referrals, distributing medicine, and responding to medical emergencies throughout the jail complex. Dr. King recalled that defendant was an enthusiastic, conscientious, and dedicated employee who did not miss work. Defendant’s work was reliable.

C. 
Investigator

Appolon Beaudouin, Jr., chief investigator for the Capital Resource Center, testified over the State’s objection that he attempted to locate the more than 50 people who wrote letters to the court in 1982. He found some letter writers. Some were willing to testify at the evidentiary hearing, including Bishop Hogan and Emitt R. Jordan. Beaudouin, however, was not able to locate 25 to 30 of the letter writers, either because they were dead or left no forwarding address. The Capital Resource Center was not available for defense counsel to use in 1982.

D. 
Defendant

Defendant testified that he was in pretrial custody from March 1981 through December 1981. Defense counsel began representing him in July of 1981. While defendant was in custody, counsel only met with him in court or in the “bullpen” for about 15 minutes before court appearances, and he never discussed preparation for a sentencing hearing.

After defendant was released on bond, he met with his counsel at court appearances and three or four times at his law office. During these meetings, counsel never discussed preparation for a sentencing hearing, never asked defendant to sign release forms for information, and never asked defendant for information about himself or for the names of any persons who might testify on his behalf. Later, after the trial began, counsel still did not discuss with defendant any preparation for a sentencing hearing.

After defendant was found guilty on June 8, 1982, counsel advised him to waive his right to a jury for sentencing. Defendant did so. Also after being found guilty, defendant asked counsel what they were going to do about sentencing. Counsel responded that defendant’s parents and wife were collecting letters on his behalf. During the recess in the sentencing hearing from June 9, 1982, until July 1, 1982, counsel did not communicate with defendant at all. Defendant would have assisted counsel in gathering mitigation evidence had he been asked.

E. 
Evidence Excluded by Circuit Court

On December 5, 1995, when the evidentiary hearing began, defendant proposed to include in his witness list four expert witnesses: Dr. Michael Gelbort, Dr. Myra Levick, Jeffrey Eno, and W. Jameson Kunz. The circuit court granted the State’s motion 
in limine
 to preclude all of the expert testimony.

Defendant later filed a motion for reconsideration of the circuit court’s ruling regarding expert testimony or, in the alternative, leave to make offers of proof. The motion was supported by over 80 pages of expert affidavits, exhibits, and resumes. Defendant also filed the affidavits of two additional mitigating witnesses, Clarence McKay and Eddie Madgett.

In response, the State moved to strike the attachments and exhibits attached to defendant’s motion to reconsider and moved to strike the affidavits of McKay and Madgett. The circuit court granted these requests. The circuit court also denied defendant’s request to make offers of proof of the above, with one exception. The affidavit of Jeffrey Eno was allowed in the record.

Following the circuit court’s final ruling, on February 9, 1996, defendant moved to vacate the judgment. All the material ordered stricken above was attached to that motion. The State again moved to strike this material, and the circuit court granted the motion.

Finally, the circuit court excluded the testimony of Karen Popek, the attorney who represented defendant on direct appeal. The circuit judge allowed an offer of proof of Popek’s testimony to be given. The circuit judge, however, left the courtroom during the offer.

F. 
Circuit Court’s Order

After considering the evidence before it, the circuit court held that defendant was not denied effective assistance of counsel at his sentencing hearing. The court first characterized defendant as an uncooperative client. The court then evaluated the mitigation testimony presented by eight of defendant’s nonfamily witnesses, Robert Forberg, Belinda Jackson, Emitt R. Jordan, Perrena Madgett, Clarencetta Thomas, John Chamberlain, Dr. George Geis, and Dr. Lambert King. The court found that none of these witnesses had any significant contact with defendant for several years before the double murders of which he stands convicted, and that their testimony related only to their impression of defendant’s character during his childhood years. He thus dismissed their testimony, concluding that it would not have changed the result of the sentencing hearing had it been presented.

With respect to other mitigation testimony, the circuit court determined that it was reasonable trial strategy not to present it because it likely would have divulged aggravating factors. The aggravating factors identified by the court were evidence that Michael Weaver was a friend of the Thompkins family, that Sandra Douglas was defendant’s mistress, and that defendant was the leader of a street gang. Accordingly, the court denied defendant’s post-conviction petition and affirmed his death sentence.

IV. The Appeal in 
Thompkins III

Defendant appealed from the above circuit court order. Defendant argued that the circuit court erred during the evidentiary hearing by refusing to allow defendant to make his offers of proof, by leaving the bench during the offer of proof of Popek’s testimony, and by ordering defendant’s offers of proof to be stricken from the record. 
Thompkins III
, 181 Ill. 2d at 9. We held that this combination of events was error constituting an abuse of discretion. 
Thompkins III
, 181 Ill. 2d at 11-13. This error worked to deprive this court of a proper record with which to review defendant’s ineffective assistance of counsel claim. 
Thompkins III
, 181 Ill. 2d at 12-13. Therefore, we remanded the cause to the circuit court with directions to reopen the evidentiary hearing for the purpose of permitting defendant to make the above offers of proof in the court’s presence. 
Thompkins III
, 181 Ill. 2d at 13. We further directed the court to “reevaluate and reenter its evidentiary rulings in light of the proffers following their presentation,” and to “reenter any other finding it deems necessary as a result of its reconsideration.” 
Thompkins III
, 181 Ill. 2d at 13.

Defendant additionally argued that the circuit court erred in excluding from evidence the affidavits of the two mitigating witnesses, Clarence McKay and Eddie Madgett. 
Thompkins III
, 181 Ill. 2d at 17. We directed the circuit court to reconsider this evidentiary ruling in light of the proper standard of admissibility. 
Thompkins III
, 181 Ill. 2d at 18. Relevance and reliability are the two factors controlling admissibility of evidence at a capital sentencing hearing. 
Thompkins III
, 181 Ill. 2d at 18. We further directed the court that, after reconsideration, it shall reenter its ruling and “make any other finding it deems necessary as a result.” 
Thompkins III
, 181 Ill. 2d at 18.

We retained jurisdiction over the cause. 
Thompkins III
, 181 Ill. 2d at 23.

V. The Reopened Evidentiary Hearing in 1998

The circuit court reopened the evidentiary hearing as instructed. The circuit court heard the testimony of the four expert witnesses, as well as the testimony of Popek, McKay, and Madgett.

Dr. Michael M. Gelbort, a clinical psychologist specializing in neuropsychology, testified that tests were administered to defendant in 1995 and again in 1998. The results of those tests indicated that defendant’s thinking abilities are not in the normal range, that defendant has defects in cognitive abilities, that defendant does not have accurate or efficient perception, and that defendant has reasoning difficulties. According to Dr. Gelbort, defendant has a brain dysfunction of some sort, which is clinically referred to as “Minimal Brain Dysfunction.” He stated that these deficits are not new, but stem from some time in the past such as defendant’s childhood. Dr. Gelbort made this determination after gathering test data and reconciling it with defendant’s historical information. He believed that defendant gave him relatively accurate information about his history. Dr. Gelbort, however, never explained what historical information he used to determine that defendant had brain dysfunction as of 1982.

On cross-examination, the State asked Dr. Gelbort about the large variance that existed between the vision and verbal memory tests. Once Dr. Gelbort acknowledged that no visual acuity test had been given before the vision memory test, the State pointed out that defendant obtained prescription glasses shortly after the tests were administered.

Dr. Gelbort admitted that he was not aware of defendant’s work history and could not explain how an emergency medical technician could function with Minimal Brain Dysfunction. The normal or average range test score was 90 to 110, and defendant’s test score of 90 placed him at the bottom of that range.

The State also raised several questions with respect to the scoring of the exams. Although defendant gave virtually identical answers on the 1995 and 1998 exams, defendant was given the highest score of 2 for his 1995 answers and the lowest score of 0 for his 1998 answers. Dr. Gelbort admitted that in at least one of the comparisons he made a mistake scoring the exams.

The circuit court qualified and accepted Dr. Gelbort as an expert in neuropsychology. The court found Dr. Gelbort’s testimony to be relevant and reliable and, thus, admitted it into evidence. The court further found that Dr. Gelbort’s testimony indicated that in 1982 defendant’s trial counsel could have obtained a psychological evaluation to determine if defendant had any psychological problems.

The State presented Dr. Edward Mahoney as a rebuttal witness. The circuit court qualified and accepted Dr. Mahoney as an expert in clinical and forensic psychology. He testified concerning the discrepancies that existed in Dr. Gelbort’s scoring, the different ways to interpret test results, and the validity of test results when an incomplete battery of tests is administered. Dr. Mahoney analyzed the test results and was not able to conclude that defendant suffers from any brain deficit.

Defendant next presented the testimony of W. Jameson Kunz, an experienced public defender who has represented defendants in capital cases. Kunz testified that the performance of defense counsel at the sentencing hearing fell below prevailing professional norms in 1982 and that, had counsel performed reasonably under those norms, a substantial amount of mitigating evidence would have been introduced on defendant’s behalf at the sentencing hearing. The circuit court qualified and accepted Kunz as an expert in death penalty cases. The court found Kunz’s testimony to be relevant and reliable and, thus, admitted it into evidence.

Dr. Myra Levick, an art therapist, testified that she analyzed the drawings of Robin Johnson, defendant’s daughter, to determine how Robin perceives her relationship with her father. According to Dr. Levick, Robin is close with her father and feels that he has always been there for her. Robin feels alone and abandoned when her father is not around. She further testified that art therapy was available in 1982 and could have been used at that time with similar results. The circuit court qualified and accepted Dr. Levick as “a psychologist and expert art therapist.” The court found Dr. Levick’s testimony to be relevant and reliable and, thus, admitted it into evidence.

Jeffrey Eno testified that he formerly worked as a mitigation specialist for the Capital Resource Center, and currently is a clinical and forensic social worker. He prepared a social evaluation for defendant’s case in 1995. Eno testified extensively regarding the mitigation evidence that trial counsel could have uncovered on defendant’s behalf in 1982 had he conducted a proper investigation. The circuit court qualified and accepted Eno as an expert “who offered an opinion concerning the extent of mitigation evidence that was available to trial counsel at the sentencing hearing in 1982.” The court found Eno’s testimony to be relevant and reliable and, thus, admitted it into evidence.

Karen Popek, defendant’s attorney on direct appeal, testified at the reopened evidentiary hearing that when she obtained the trial file from defendant’s trial counsel, he told her that he liked defendant and that he hoped she would be successful on appeal. Trial counsel never told Popek that defendant was uncooperative. Popek described defendant as cooperative. Defendant was forthcoming with information and did his own research. The circuit court found Popek’s testimony to be relevant and reliable and, thus, admitted it into evidence. The court also found that Popek’s testimony indicated that defendant was cooperative with counsel.

Lastly, at the reopened evidentiary hearing, the circuit court heard the testimony of the two additional mitigating witnesses. Clarence McKay testified that he has known defendant since childhood, when they were neighbors and friends. During their teenage years, defendant was a youth counselor at a summer fun club. He led McKay and others in sports and activities. McKay observed that defendant was patient and kind to children, and eager to teach.

McKay regularly saw defendant up until the time that defendant was imprisoned for this case. As adults, from 1975 to 1977, McKay and defendant carpooled together to their jobs in Chicago every day. They talked and joked during the rides. Defendant was prompt and would call McKay in the morning to ensure that he was awake. McKay recalled that, during the rides home, defendant was “always in a hurry to go home, to be with his family.” McKay observed defendant interact with his own children. He cooked for them, and hugged and kissed them.

McKay is aware that defendant served time in prison in the early 1970s for shooting Weaver. Defendant counseled McKay not to make this same kind of mistake. Despite everything, McKay believes that defendant is “a regular guy like me,” and considers him a friend.

At the request of defendant’s mother, McKay wrote a letter to the trial court in 1982. Defendant’s trial counsel, however, never contacted him or asked him to testify at the sentencing hearing. Had McKay been asked, he would have testified in 1982.

The circuit court found McKay’s testimony to be relevant and reliable and, thus, admitted it into evidence. The court additionally admitted McKay’s affidavit into evidence.

Eddie Madgett testified that he and defendant were good friends as children and remained close as adults. Madgett described defendant as a good father and husband. Madgett believes that defendant’s life should be spared. Defense counsel never contacted Madgett in 1982. Madgett, however, was available at that time and would have testified on defendant’s behalf had he been asked. The circuit court found Madgett’s testimony to be relevant and reliable and, thus, admitted it into evidence. The court additionally admitted Madgett’s affidavit into evidence.

After reviewing the 1995 evidentiary hearing and the 1982 sentencing hearing, the circuit court made the following additional findings. The court found that “there was significant and relevant mitigation evidence that was not introduced by trial counsel at the sentencing hearing in 1982.” This mitigation evidence could have been presented to the sentencing judge to demonstrate that, in witnesses’ opinions, defendant was “a good son, husband, father, friend, and worker”; that defendant “may have helped save the life of a youth officer who later became the Chief of Police of Markham”; and that defendant “was kind to women and protective of them.”

The circuit court, however, declined to disturb the ultimate conclusion entered in 1995 that defendant was not denied effective assistance of counsel at his sentencing hearing. The cause was then returned to this court.

ANALYSIS

This post-conviction appeal follows a full evidentiary hearing on the issue of whether defendant received constitutionally ineffective assistance of counsel at sentencing. A circuit court’s grant or denial of post-conviction relief at the conclusion of an evidentiary hearing will not be disturbed on appeal unless manifestly erroneous. 
People v. Coleman
, 183 Ill. 2d 366, 385 (1998).

Defendant contends that the facts presented at the evidentiary hearing establish that he was deprived of his constitutional right to effective assistance of counsel at his sentencing hearing. According to defendant, the evidentiary hearing showed that his counsel failed to adequately investigate and present mitigating evidence. He submits that the substantial mitigation evidence presented by his post-conviction counsel supports his claim.

In evaluating claims of ineffective assistance of counsel at a capital sentencing hearing, the “benchmark” must be whether counsel’s conduct so undermined the proper functioning of the adversarial process that the sentencing hearing cannot be relied upon as having produced a just result. 
Strickland v. Washington
, 466 U.S. 668, 686, 80 L. Ed. 2d 674, 692-93, 104 S. Ct. 2052, 2064 (1984). The standard for assessing whether an attorney’s performance at a capital sentencing hearing was constitutionally deficient is well established. The defendant must show that (1) counsel’s performance was so deficient that it fell below an objective standard of reasonableness, and (2) there is a reasonable probability that, but for counsel’s deficient performance, the resulting sentence would have been different. 
Strickland
, 466 U.S. at 689-94, 80 L. Ed. 2d at 694-98, 104 S. Ct. at 2065-68; 
e.g.
, 
People v. Howery
, 178 Ill. 2d 1, 55 (1997).

As to the performance prong, the defendant must overcome the strong presumption that the challenged action of counsel might be considered sound trial strategy. 
Strickland
, 466 U.S. at 689, 80 L. Ed. 2d at 694-95, 104 S. Ct. at 2065; 
e.g.
, 
Howery
, 178 Ill. 2d at 55. The United States Supreme Court has stated, with regard to the alleged failure to investigate:

“These standards require no special amplification in order to define counsel’s duty to investigate ***. *** [S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel’s judgments.” 
Strickland
, 466 U.S. at 690-91, 80 L. Ed. 2d at 695, 104 S. Ct. at 2066.

Hence, counsel has a duty to investigate potential sources of mitigating evidence to present at the capital sentencing hearing, or must have a sound reason for not making the investigation. 
E.g.
, 
People v. Towns
, 182 Ill. 2d 491, 510 (1998) (and cases cited therein); 
People v. Orange
, 168 Ill. 2d 138, 170 (1995). Although courts are highly deferential in reviewing counsel’s strategic decisions whether to present certain mitigating evidence, such deference is not warranted where the lack of mitigation evidence presented stems not from strategy, but from counsel’s failure to properly investigate and prepare the defense. See 
Towns
, 182 Ill. 2d at 510, 513-15; 
People v. Ruiz
, 177 Ill. 2d 368, 385 (1997); 
People v. Coleman
, 168 Ill. 2d 509, 535 (1995); 
Orange
, 168 Ill. 2d at 170.

In the present case, the evidentiary hearing established that defense counsel failed to adequately investigate sources of mitigating evidence on defendant’s behalf, and that he had no sound reason for failing to do so. Counsel testified that he began representing defendant for the underlying murders approximately one year before the trial began. Counsel knew from the start that the State might seek the death penalty. Nonetheless, counsel’s testimony indicated that he did very little to prepare for the sentencing hearing. Counsel met with defendant and asked him general questions about his background and family. Counsel admitted, however, that he never asked defendant to provide him with the names of persons who could help him prepare for the sentencing hearing. When counsel was asked if he met with any members of defendant’s family, he responded that he met once with defendant’s wife, but could not recall the length of this meeting. He also spoke with defendant’s parents, but never had an actual meeting with them. Counsel never met with any of defendant’s brothers or children or defendant’s aunt. He never met with any of defendant’s supervisors, coworkers or friends. In addition, counsel never sought to obtain any records concerning defendant’s education, employment, military service or prison incarceration. Although counsel did ask defendant’s mother to collect letters on defendant’s behalf, he did not participate in the collection of those letters, nor did he make any effort to speak to the letter writers himself to see if they could testify. Rather, counsel appeared to leave the matter of investigating to defendant, saying: “It was his case. It was not my case.” We thus conclude that counsel failed to investigate the circumstances of defendant’s life.

According to counsel, he decided to present defendant’s wife as the sole mitigation witness at the sentencing hearing because he did not believe that the particular sentencing judge making the decision would be impacted by anything other than the facts of the underlying case and defendant’s criminal background. This rationale was not an objectively reasonable basis for counsel’s decision not to investigate mitigation evidence. As counsel admitted, he did not know that defendant would waive his right to a sentencing jury until the night before the sentencing hearing began. Thus, this rationale cannot explain why counsel did not investigate mitigating evidence during the year before trial began. See 
Towns
, 182 Ill. 2d at 512 (noting that it may be objectively unreasonable for an attorney to wait until after the guilty verdict to begin preparations for an imminent capital sentencing hearing). Even more importantly, because counsel failed to conduct an investigation and uncover what the possible mitigation witnesses would have to say, he was in no position to make a reasoned decision whether their testimony would have any impact on the judge. See 
Strickland
, 466 U.S. at 690-91, 80 L. Ed. 2d at 695, 104 S. Ct. at 2066; 
Towns
, 182 Ill. 2d at 510, 513-15; 
Ruiz
, 177 Ill. 2d at 385; 
Coleman
, 168 Ill. 2d at 535; 
Orange
, 168 Ill. 2d at 170. In conclusion, counsel’s rationale for failing to investigate mitigating evidence stemmed not from a reasonable strategy, but from an objectively unreasonable failure to investigate. As such, counsel’s performance was constitutionally deficient.

We now determine whether defendant has satisfied the prejudice prong of the 
Strickland
 test. As to this prong, the Supreme Court has explained: “When a defendant challenges a death sentence ***, the question is whether there is a reasonable probability that, absent the errors, the sentencer–including an appellate court, to the extent it independently reweighs the evidence–would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.” 
Strickland
, 466 U.S. at 695, 80 L. Ed. 2d at 698, 104 S. Ct. at 2069; see 
People v. Tenner
, 175 Ill. 2d 372, 384 (1997). A “reasonable probability” is “a probability sufficient to undermine confidence in the outcome” of the sentencing hearing. 
Strickland
, 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068. This court has also observed that “[m]itigating evidence is extremely important under the Illinois capital sentencing scheme.” 
People v. Perez
, 148 Ill. 2d 168, 194 (1992). The sentencer must consider the mitigating factors, weigh those against the aggravating factors, and determine whether the mitigating factors are sufficient to preclude imposition of the death penalty. 
People v. Davis
, 185 Ill. 2d 317, 350 (1998); see 
Thompkins I
, 121 Ill. 2d at 452.

In this case, at the conclusion of the reopened evidentiary hearing in 1998, the circuit court found that “there was significant and relevant mitigation evidence that was not introduced by trial counsel at the sentencing hearing in 1982.” The court further found that this mitigation evidence could have been presented to the sentencing judge to demonstrate that, in witnesses’ opinions, defendant was “a good son, husband, father, friend, and worker”; that defendant “may have helped save the life of a youth officer who later became the Chief of Police of Markham”; and that defendant “was kind to women and protective of them.” We agree with these findings.

Even a brief review of the mitigating evidence presented at the evidentiary hearing demonstrates that a wealth of mitigation was available to defense counsel in 1982, none of which was investigated or presented at defendant’s capital sentencing hearing. A former chief of police credited defendant with saving his life when he was a young officer. He also claimed that defendant aided his police work in other ways, including the prevention of a violent turf war between 200 youths who had gathered in a park. He further observed defendant’s participation in charitable activities, such as delivering food to poor families at Thanksgiving and repairing broken toys to give to needy children at Christmas. Several of defendant’s family members testified that defendant was a loving and valued son, husband, brother, and father. Several of defendant’s friends described defendant as a good person. His female friends in particular related defendant’s acts of kindness toward them. A fellow prison inmate testified that defendant broke up fights in prison. A church bishop related that, from his observations and conversations with defendant, he found defendant to be respectful, intelligent, and loving and devoted to his wife and children. Two physicians who supervised defendant’s work as a paramedic and medical corpsman testified that defendant was a reliable and dedicated employee. They also related that defendant was entrusted with important tasks such as distributing medicine, responding to emergencies, and speaking with inmates with health problems.

Moreover, defendant’s attorney on direct appeal related that defendant was cooperative with her and did his own research. Two additional male friends of defendant, Clarence McKay and Eddie Madgett, testified concerning defendant’s positive attributes. McKay noted that he regularly saw defendant up until the time that defendant was imprisoned for this case. Also as adults, from 1975 to 1977, McKay and defendant carpooled together to their jobs on a daily basis, and talked and joked during the rides. Defendant called McKay to ensure that he was awake. McKay observed defendant’s desire to spend time with his family and his positive interactions with his children. Madgett testified that he and defendant remained close friends as adults. He described defendant as a good father and husband. He believes that defendant’s life should be spared. Having reviewed all the mitigating evidence presented at the evidentiary hearing, we are persuaded that, had trial counsel introduced it at the sentencing hearing, there is a reasonable probability that the sentencer would have concluded that the balance of aggravating and mitigating circumstances did not warrant death. We therefore conclude that defendant was denied effective assistance of counsel at his sentencing hearing.

As noted above, we agree with the findings entered by the circuit court at the conclusion of the reopened evidentiary hearing in 1998. Although those findings seem to undermine the circuit court’s ultimate conclusion, in 1995, that defendant was not denied effective assistance of counsel at sentencing, the circuit court in 1998 declined to disturb that earlier conclusion. For the reasons set forth both above and below, we conclude that the circuit court’s holding that defendant was not denied effective assistance of counsel at sentencing is manifestly erroneous.

As to prejudice, the circuit court in 1995 evaluated the mitigation testimony presented by eight of defendant’s nonfamily witnesses, Forberg, Jackson, Jordan, Perrena Madgett, Thomas, Chamberlain, Dr. Geis, and Dr. King. The court found that none of these witnesses had any significant contact with defendant for several years before the double murders of which he stands convicted, and that their testimony related only to their impressions of defendant’s character during his childhood years. The court therefore dismissed their testimony, concluding that it would not have changed the result of the sentencing hearing had it been presented.

Contrary to the circuit court’s finding, the testimony given by these eight witnesses cannot be characterized as mere childhood impressions and cannot be limited as relating only to contacts with defendant several years before the underlying offenses. The underlying offenses in this case took place in 1980, when defendant was at least 30 years of age. Defendant’s friend Chamberlain testified that he continued to see defendant through the early 1980s. The two physicians who supervised defendant’s work, Drs. Geis and King, knew defendant as an adult in the late 1970s. It appears that friends Perrena and Jackson may have remained in touch with defendant until his arrest in 1981. Also, the testimony at the reopened 1998 evidentiary hearing by Popek, defendant’s attorney on direct appeal, and McKay and Madgett, related to their impressions of defendant during the 1980s. We note, moreover, that mitigating evidence of the magnitude presented by these witnesses cannot be discarded for the reason set forth by the circuit court.

With regard to the performance prong, the circuit court gave two reasons for its conclusion in 1995 that counsel’s performance was not deficient. First, the court characterized defendant as an uncooperative client. This finding cannot stand. The mere fact that a client is uncooperative will not excuse a failure to investigate in a capital case. See 
Perez
, 148 Ill. 2d at 192-93. Counsel remains obligated to conduct a reasonable investigation. 
Towns
, 182 Ill. 2d at 510-13. Here, counsel did not fulfill this duty. Counsel testified that he never asked defendant for the names of persons to contact. Counsel further testified that the only other person he interviewed for mitigating evidence was defendant’s wife. Counsel did not interview defendant’s parents for information, despite the fact that they often appeared in court. Counsel interviewed no other persons, and made no effort to obtain any of defendant’s records.

Second, as to some of the mitigation testimony, the circuit court determined that it was reasonable trial strategy not to present it because it likely would have divulged aggravating factors. The aggravating factors identified by the court were evidence that Michael Weaver was a friend of the Thompkins family, that Sandra Douglas was defendant’s mistress, and that defendant was the leader of a street gang. The circuit court erred in rejecting defendant’s ineffectiveness claim on this basis. As noted above, this court has repeatedly recognized that, although courts are highly deferential in reviewing counsel’s strategic decisions whether to present certain mitigating evidence, such deference is not warranted where the lack of mitigation evidence presented stems not from strategy, but from counsel’s failure to properly investigate and prepare the defense. See 
Towns
, 182 Ill. 2d at 513-15 (and cases cited therein). There is no evidence in the record that counsel made a strategic decision not to present additional mitigating evidence for fear of the aggravating evidence that could be introduced in response. Rather, the testimony presented at the evidentiary hearing amply demonstrated that counsel did not present the mitigating evidence at issue because he failed to properly investigate and prepare the defense.

A final matter remains to be addressed. This court has, on numerous occasions, rejected defendants’ claims that they were prejudiced by their attorneys’ failure to present certain mitigating evidence at the defendants’ capital sentencing hearings, where the aggravating evidence was overwhelming and far outweighed the mitigating evidence. 
People v. Morgan
, 187 Ill. 2d 500, 561-63 (1999) (Bilandic, J., dissenting) (discussing cases); see, 
e.g.
, 
People v. Evans
, 186 Ill. 2d 83, 102 (1999); 
People v. Coleman
, 183 Ill. 2d 366, 403-07 (1998); 
People v. Johnson
, 183 Ill. 2d 176, 205 (1998); 
People v. Mahaffey
, 165 Ill. 2d 445, 466-68 (1995); 
People v. Caballero
, 152 Ill. 2d 347, 366-67 (1992); 
People v. Jones
, 144 Ill. 2d 242, 278-80 (1991). The present case is distinguishable from those cases. Although some aggravating evidence exists, the mitigating evidence presented at the evidentiary hearing is quite substantial. A sentencing judge or jury may even consider it extraordinary. Consequently, the aggravating evidence does not so outweigh the mitigating evidence that we may reject defendant’s claim.

The circuit court’s holding that defendant was not denied effective assistance of counsel at his sentencing hearing is hereby reversed as manifestly erroneous. We therefore vacate defendant’s death sentence and remand this cause for a new sentencing hearing. The sentencing judge’s conclusion that defendant is eligible for the death penalty remains standing. Accordingly, if the State seeks capital punishment for defendant on remand, only the second phase of defendant’s capital sentencing hearing need be conducted anew. See 
Davis
, 185 Ill. 2d at 351; 
People v. Turner
, 128 Ill. 2d 540, 573 (1989); 
People v. Rogers
, 123 Ill. 2d 487, 523 (1988).

CONCLUSION

Defendant received constitutionally ineffective assistance of counsel at the second phase of his sentencing hearing. We therefore vacate his death sentence and remand this cause to the circuit court of Cook County for further sentencing proceedings consistent with this opinion.

Death sentence vacated;

cause remanded.