(No. 83279.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. JULIUS S. KUNTU, Appellant.

*Opinion filed May 24, 2001.*

HARRISON, C.J., specially concurring.

FITZGERALD, J., joined by THOMAS and GARMAN, JJ., dissenting.

Charles M. Schiedel, Deputy Defender, and Charles W. Hoffman, Assistant Defender, of the Office of the State Appellate Defender, of Chicago, for appellant.

James E. Ryan, Attorney General, of Springfield, and Richard A. Devine, State's Attorney, of Chicago (William L. Browers, Assistant Attorney General, of Chicago, and Renee Goldfarb and William L. Toffenetti, Assistant State's Attorneys, of counsel), for the People.

JUSTICE FREEMAN delivered the opinion of the court:

Following a jury trial in the circuit court of Cook County, defendant, Julius Kuntu, was convicted of seven counts of first degree murder and one count of aggravated arson. 720 ILCS 5/9—1(a), 20—1.1(a) (West 1994). At a separate sentencing hearing, the same jury found defendant eligible for the death penalty and further determined that there were no mitigating circumstances sufficient to preclude imposition of that sentence. Accordingly, the trial court sentenced defendant to death on the murder convictions and to a 30-year prison term on the aggravated arson conviction. The death sentence has been stayed pending direct review by this court. Ill. Const. 1970, art. VI, § 4(b); 134 Ill. 2d Rs. 603, 609(a).

Retaining jurisdiction, this court remanded the cause to the trial court for an evidentiary hearing to determine whether a relationship existed between the jury foreperson and Cook County State's Attorney Richard Devine and, if so, whether defendant was thereby prejudiced. *People v. Kuntu*, 188 Ill. 2d 157, 162 (1999). The trial court found that "[i]t was a casual relationship at best," which did not prejudice defendant's right to a fair trial.

The cause was returned to this court. We now affirm defendant's convictions, as modified, but reverse his death sentence and remand the cause for a new death sentencing hearing.

## BACKGROUND

The State's evidence at trial was essentially as follows. Defendant, his girlfriend Toni Junes, and their baby lived in an apartment at 917 West Dakin Street in Chicago (hereafter building). The four-story building contained 47 apartments. On Saturday, March 19, 1994, Edward Adler, the managing partner in the partnership that managed the building, and Judge DeLeon, the on-site building manager, spoke with tenants who were behind in their rent. Defendant was one such tenant. Adler told defendant that defendant had fallen too far behind in his rent and that Adler was going to evict defendant. Adler explained to defendant, however, that if defendant left prior to Monday, Adler would forgive the back rent that defendant owed.

At approximately 7 a.m. on Sunday, March 20, defendant, Junes, and their baby left their apartment carrying bags. Edward Stacy, defendant's friend who lived across the street, saw them at the Sheridan Road station on the CTA Dan Ryan "El" line. Defendant told Stacy that "they locked him out, so [defendant] was going to burn their ass out." Stacy warned defendant "not to do anything stupid."

After leaving Junes and their baby at the home of Junes' aunt in Riverdale, defendant returned to the area of the building. At approximately noon, he went to Stacy's apartment. Discussing the building, defendant told Stacy: "I am going to set the motherfucker on fire either after work or sometime this week." Stacy repeated his earlier warning to defendant, who then left.

At approximately noon, Larry Weaver, who lived in the building and knew defendant, saw him at a nearby gasoline station at the corner of Irving Park and Sheridan Roads. Carrying a bucket, defendant entered the station.

Defendant attempted to buy gasoline. The station attendant, Jose Bautista, told defendant that he could not

buy gasoline in a bucket, but that he could buy a plastic gasoline can. Defendant bought a red gasoline can and gave the bucket to Bautista. The gasoline can cost $7.50; defendant paid for it with a $10 bill and bought gasoline with the change.

At around 12:30 p.m., Faustino Piniero, a neighbor who lived across the street from defendant, was sitting by his front window looking out at the building. Piniero saw defendant, whom he recognized, enter the building carrying a red gasoline can. Approximately five minutes later, Piniero saw defendant exit the building without the can. Shortly thereafter, Piniero saw smoke coming from the building.

DeLeon lived in a first-floor apartment in the building. At approximately 12:40 p.m., he was awakened by a loud kick to the door. Seconds later, he heard a voice he recognized as defendant's say: "Fuck you." DeLeon arose and looked through the peephole in his door, but saw only darkness. He opened the door and saw smoke and people shouting and screaming. He and his daughter left the building. He saw much smoke coming from the fourth-floor windows. He saw one tenant, Armando Tapia Rodriguez, jump from his window. Tapia broke a leg. DeLeon saw another tenant, Persephone Estes, drop children from a window. DeLeon caught one child himself; he injured his arm catching a second child. A third child was dropped onto a mattress.

The fire was set on the third-floor landing of the enclosed rear stairwell. It engulfed that portion of the stairs and spread to other areas of the building. Seven persons, all residents of fourth-floor apartments, died as a result of the fire. Six of those persons died from carbon monoxide poisoning and smoke inhalation: Jacqueline Vargas, age 15; Rolando Frausto, age 31; his wife Gladys Lopez, age 29; their children Gary Frausto, age 3, and Karen Frausto, age 5; and Gladys' brother Gary Lopez, age 15.

Their bodies displayed severe thermal burns, which probably occurred after they died. The seventh fatality, John McKinney, age 43, died from multiple injuries suffered when he jumped from a fourth-floor window. Also, firefighter Kenneth Dorsen and many other tenants suffered injuries as a result of the fire.

Shortly after the fire was extinguished, investigators determined that the fire was intentionally set with gasoline. At the scene of the fire, Chicago police officers Dennis Connelly and Patrick Moyer questioned DeLeon, Weaver, and Stacy. At approximately 3 p.m., the officers left the scene and drove to the Popeye's Fried Chicken Restaurant at 1959 West Howard Street, where defendant worked, and arrested him. Although defendant was not scheduled to work until 4 p.m., he had been at the restaurant prior to 2 p.m. Officer Connelly saw that the hair on the top rear of defendant's head was singed. Connelly also smelled a strong odor of gasoline on defendant.

The officers placed defendant in the rear seat of their vehicle in the restaurant parking lot and waited for assistance. Officer Connelly then gave defendant *Miranda* warnings. Approximately 10 minutes later, several police officers arrived, including Officer Connelly's supervisor. Connelly was directed to take defendant to the 23rd District police station.

En route to the police station, defendant spontaneously and voluntarily spoke to the officers. Defendant told the officers as follows. He had argued with his landlord over rent and had intended to get even with him. Defendant's landlord had threatened to have the sheriff throw him out of his apartment and lock him up. This angered defendant. He obtained gasoline as earlier described, went to the building, went up to the third-floor rear landing, poured the gasoline onto the landing, lit a match, and threw the lighted match onto the gasoline. Defendant then ran from the building.

A few hours later at the police station, defendant gave a court-reported statement, in which he again confessed to the above-described acts. In addition, defendant stated that on the night of March 19, 1994, the electricity in his apartment was cut off. DeLeon came to defendant's apartment and told him that the electricity was cut off because defendant had failed to pay the rent. On March 20, after defendant left with Junes and their child, the apartment was padlocked.

Also, the assistant State's Attorney who took defendant's statement asked defendant whether he knew how many persons lived in the building. Defendant responded: "I don't think very many because people wouldn't live there. Because the guy was irresponsible [sic] of taking care of things." Defendant also stated that: from the time that he was in custody, no one made any threats or promises to him; he understood that the assistant State's Attorney who spoke with him was a prosecutor and not his lawyer; he was given and understood the *Miranda* warnings. We note that Adler, in his trial testimony, denied having defendant's electricity cut off and having defendant's apartment door padlocked.

Shortly after his arrest, police seized defendant's clothing, which was tested for the presence of accelerants. Tests of his coat and shirt were negative, tests of his pants were inconclusive, but tests of his shoes revealed the presence of gasoline. During an inspection of the building five days after the fire, a melted piece of red plastic was found among the debris toward the rear of the third floor. It smelled strongly of gasoline, the presence of which was confirmed by subsequent testing.

Defendant was charged in a 43-count indictment. He was charged with 28 counts of first degree murder in connection with the deaths of the seven victims of the fire. He was charged with intentional and knowing murder (720 ILCS 5/9—1(a)(1), (a)(2) (West 1994)) and felony

murder based on both the felonies of arson and of aggravated arson (720 ILCS 5/9—1(a)(3) (West 1994)). He was also charged with 14 counts of aggravated arson (720 ILCS 5/20—1.1(a) (West 1994)) and one count of arson (720 ILCS 5/20—1(a) (West 1994)). Subsequently, the State entered a *nolle prosequi* on 14 of the murder counts, 11 of the aggravated arson counts, and the arson count.

The defense case was essentially that the State failed to prove defendant guilty of the charged offenses beyond a reasonable doubt. The theory of the defense was that defendant was an innocent person whom the State could conveniently blame for the fire. The defense attacked the credibility of the State's witnesses and argued that defendant's confession was not knowing and voluntary. The defense case consisted of testimony regarding defendant's background, mental condition, and whereabouts at the time of the fire.

Karen Affram, defendant's mother, testified as follows. Her father impregnated her when she was 15 years old. Defendant's birth, on February 22, 1968, was the result of this incestuous act. Her pregnancy had complications, and defendant's infancy was abnormal. Defendant could not sit up at the age of two, could not walk until age four, and could not speak in sentences until age five. She could not spank defendant because "he wouldn't know what he's getting a spanking for."

As to school, defendant was placed in learning-disabled classes. He attended high school for two months. At age 22, defendant could not read. He then attended a reading class with his mother. He lasted in the class for approximately two weeks because the work was too difficult for him.

Defendant began working at age 18. Defendant had a series of jobs; he was never able to hold one for more than a month due to his lack of comprehension. In 1992,

defendant's mother moved to San Antonio, Texas. She had kept in touch with defendant by having him telephone her collect monthly.

Toni Junes testified as follows. She was 20 years old and met defendant when she was age 16. Defendant was the father of her three-year-old son. When they lived at the building, defendant at one point held three jobs, one of which was working at the Popeye's restaurant. The rent was $300 per month. Defendant had complained about the kitchen and bathroom sinks, the toilet, and the presence of rats and roaches. A few months prior to the fire, defendant and Junes stopped paying rent because the building management did not do anything about these problems. The night before the fire, their apartment did not have electricity.

Theophilus Green, a clinical psychologist, testified as follows. The defense hired him to evaluate defendant's mental condition. Green interviewed defendant in October 1995, April 1996, and March 1997. Although defendant was legally sane at the time of the offenses, he nevertheless suffered from an emotional illness and mental defect. Defendant scored 58 on an IQ test that Green administered. Based thereon, Green opined that defendant was, in Green's words, mentally retarded. Defendant suffered from schizo-affective disorder and mental retardation. "Schizo-affective" meant that defendant had difficulty with relationships and reality. Intellectually and emotionally, defendant's problem-solving and reasoning capabilities were below average or immature.

Also, Green did not believe that defendant was malingering. However, Green acknowledged that feigning mental illness was especially likely to occur in criminal cases, and that there was no foolproof method to disclose malingering.

The defense also presented alibi testimony. Junes

testified as follows. On the morning of March 20, 1994, she and defendant took a CTA "El" train to the end of the Dan Ryan line, caught a bus, and then walked to her aunt's house in Riverdale. They arrived at around 11 a.m. At around noon, defendant left, saying that he was going to work. Further, Junes took $5 from defendant, leaving him with only $2.

Burton McGlothin, the manager of the Popeye's at 1959 West Howard Street when defendant worked there, testified as follows. On March 20, 1994, defendant arrived at the restaurant at around noon or 12:30 p.m. Although he was not scheduled to work that day until 4 p.m., he asked McGlothin if he could start early. McGlothin told defendant that he was not needed until his regular starting time. Defendant then went to the back of the restaurant. McGlothin did not recall previously telling an investigator that defendant arrived at the restaurant at approximately 2:45 p.m. McGlothin did not smell gasoline on defendant that day. Also, according to McGlothin, defendant was a dependable employee, with whom he had no problem communicating. Defendant did a good job at his assigned tasks.

The State's case in rebuttal consisted of testimony regarding defendant's mental condition and his whereabouts at the time of the fire.

Dr. Paul Fauteck, a clinical and forensic psychologist at the Department of Forensic Clinical Services in the circuit court of Cook County, testified as follows. Those who knew his work considered him as "being something of an expert on malingering." He had done his doctoral research on malingering, had given several presentations and had written an article on malingering, and was conducting ongoing research on the subject.

Dr. Fauteck interviewed defendant in May and July 1996, reviewed his records and the police reports, and administered an IQ test. Dr. Fauteck made the following

determinations. Defendant was malingering, and there was no evidence of psychosis. Defendant had been taking antipsychotic medication unnecessarily for over two years. Defendant's thinking was normal and goal-oriented. Defendant's IQ was 69, "which would place him at the very top of the mild range of mental retardation, right at the edge of the borderline range." However, defendant was not mentally retarded. Rather, defendant "was not doing his best on the test."

Dr. Roni Seltzberg, a forensic psychiatrist at Forensic Clinical Services, testified as follows. She interviewed defendant in August 1996. Dr. Seltzberg determined that defendant was malingering to avoid prosecution. She believed that defendant's IQ was "certainly higher" than the 69 he scored when tested by Dr. Fauteck. She opined that defendant "functioned at least at the borderline intellectual level of functioning, which is better than any kind of mental retardation, but not quite—certainly not your average intellectual functioning person."

The State also called witnesses to rebut defendant's alibi evidence. Chicago Police Detective Carl Kurth testified as follows. On March 20, 1994, he and his partner spoke with Junes at her aunt's home in Riverdale. Junes told Kurth that she and defendant arrived at her aunt's home at approximately 10 a.m., and that defendant left immediately after their arrival. Cook County State's Attorney Investigator Robert Sullivan testified as follows. On February 7, 1997, he and one of the trial prosecutors spoke with McGlothin, the manager of the restaurant where defendant worked. McGlothin told them that on March 20, 1994, defendant arrived at the restaurant sometime between 1:30 p.m. and 1:45 p.m.

At the close of the evidence, the jury returned seven general verdicts of guilty of first degree murder, and one general verdict of guilty of aggravated arson.

In the eligibility phase of the death sentencing hear-

ing, the jury found beyond a reasonable doubt the presence of a statutory aggravating factor: the murder was committed in the course of a felony, namely, aggravated arson. 720 ILCS 5/9—1(b)(6) (West 1994). Thus, the jury found that defendant was eligible for the death penalty.

At the second stage of the death sentencing hearing, the State presented victim impact evidence. Mitchell McKinney, brother of victim John McKinney, read his victim impact statement. The statements of five family members of victim Jacqueline Vargas were each read into the record. Additionally, the statements of three family members of victims Gladys and Gary Lopez were each read into the record.

Defendant's case in mitigation included the following evidence. Defendant testified as follows. He left elementary school at the age of 15, without graduating, because he had grown too old to continue attending there. He then attended high school for two months. He once had been arrested and charged with theft, but the charge was dropped when another person was arrested and convicted of that offense. Defendant had never been arrested for anything else, and had never caused anyone serious injury.

He and his family were evicted from their apartment because they withheld rent; they did so because the apartment was in disrepair and was infested with rats and roaches. On March 20, 1994, defendant took Junes and their baby to Riverdale and then went back to work at the Popeye's on Howard Street. He had only $5.

Defendant first learned of the fire when he was arrested. Police officers hit him in the parking lot of Popeye's. They threatened him with bodily harm if he did not make a statement. The assistant State's Attorney told defendant what to say and scripted the court-reported statement that he signed.

Defendant knew that he was on trial for murder,

because the building had been burned and people had died. They had been his friends, and he felt sad for them. However, he denied setting the fire. He knew that setting such a fire could cause serious injury. Defendant believed that Stacy set the fire.

During the three years that defendant was in custody, he lived in the residual treatment unit, which was the psychiatric wing, of Cook County jail. He was being administered the prescription medications Haldol, Cogentin, and Zoloft. Defendant believed that he needed the medications because when taking them he no longer heard voices and saw things.

Karen Affram, defendant's mother, and Pauline Kuntu Caballero, Affram's mother, each testified in a manner consistent with Affram's testimony at the guilt phase of the trial. Also, Theophilus Green repeated much of his testimony at the guilt phase of the trial. He concluded that defendant suffered from a mental and emotional disturbance.

At the close of the sentencing hearing, the jury found that there were no mitigating circumstances sufficient to preclude imposition of the death penalty. The trial court accordingly sentenced defendant to death on the first degree murder convictions. The court also sentenced defendant to a 30-year prison term on the aggravated arson conviction.

Defendant appeals. Additional pertinent facts will be discussed in the context of the issues raised on appeal.

## DISCUSSION

We will consider defendant's allegations of error in the sequence in which the alleged errors occurred in the proceedings below. Defendant contends that he was denied a fair trial, during *voir dire* and at the guilt phase of the trial, because: (1) a juror failed to reveal during *voir dire* his relationship with the Cook County State's Attorney; (2) the trial court admitted photographs of the

burnt victims; and (3) the State made inappropriate and prejudicial remarks during closing argument. Defendant also contends (4) that the trial court erred in entering judgment on both knowing murder and felony murder.

Defendant contends that he was denied a fair capital sentencing hearing at the eligibility phase because: (5) the State improperly used his aggravated arson conviction as the predicate felony to establish his eligibility for the death penalty; and (6) the State made improper and prejudicial remarks during closing argument. Defendant also contends (7) the jury's death eligibility verdict form did not include the required affirmative finding that he actually killed the victims.

Defendant contends that he was denied a fair capital sentencing hearing at the penalty phase because: (8) his trial counsel was constitutionally deficient for failing to present the testimony of defendant's treating psychiatrist; (9) the State made improper and prejudicial remarks during closing argument; and (10) the trial court sent the written victim impact statements with the jury during its deliberations.

Defendant also contends: (11) his death sentence is an excessive penalty; and (12) the Illinois death penalty statute is unconstitutional.

## I. The Juror and the State's Attorney

Defendant seeks a new trial because juror Paul Kosin failed to reveal his relationship with Cook County State's Attorney Richard Devine during *voir dire*. According to defendant, this failure prevented the defense from seeking Kosin's exclusion for cause or from exercising a peremptory challenge against him.

Kosin was called as a venireperson. He had never before served on a jury. The trial court introduced the venire to defendant, defense counsel, and the two trial prosecutors. The court informed the venire of the charges. The court read a list of the possible witnesses.

The court then asked the venirepersons if they were acquainted with defendant, the victims, the lawyers trying the case, or the witnesses. None were. The court repeated the question and received the same negative response.

Kosin was called as part of a panel for questioning. Reading his juror card, the trial court noted that Kosin was an attorney at "a well-known law firm in the Chicago area." Responding to the court's questions, Kosin indicated as follows. He had been an attorney since 1968 and practiced securities law. He had never worked for either a prosecutorial office or for the office of a defense attorney. In fact, he had never been in court. There was nothing about his training or experience that would prevent him from giving either side a fair trial.

During this questioning, the following colloquy occurred:

"Q. [THE COURT] Are any members of your immediate family or any of your close personal friends, and again it seems silly to ask this questions [*sic*], are they police officers or lawyers of any sort, judges, or anything at all like that?

A. My brother, Don, is a lawyer.

\* \* \*

Q. The other lawyers are lawyers that you may know or come in contact in your work?

A. Yes.

Q. Would that friendship prevent you from giving either side a fair trial in this case?

A. No."

Kosin was accepted as a juror and ultimately served as jury foreperson.

The day after the jury voted to sentence defendant to death, Kosin wrote a letter to Cook County State's Attorney Richard Devine. The letter is written on Kosin's law firm's stationery, and the salutation reads "Dear Dick." Kosin begins by explaining that he has just finished serving as a juror in defendant's trial. Kosin

notes that, given the fact that the trial prosecutors had trouble opening evidence cans, he had considered sending, in jest, paint can openers to the State's Attorney to give to his assistants. Kosin also explains that he was upset to discover that the trial prosecutors had given information to the media that was not available to the jury. The two-page letter then concludes: "Once again congratulations on being where I can write this letter to someone I know and please consider a lengthy tenure in office because, if I ever get into a jury selection for a capital crime again, I'm going to tell the judge that you're my brother."

On direct appeal, this court remanded the cause to the trial court for an evidentiary hearing to determine whether a relationship existed between the State's Attorney and Kosin "and, if such a relationship exists, whether that relationship prejudiced defendant's right to a fair trial." *People v. Kuntu*, 188 Ill. 2d 157, 162 (1999).

The trial court held an evidentiary hearing, in which Kosin and trial defense counsel testified. The trial court found as follows. The relationship between the State's Attorney and Kosin "was that of former classmates in law school. It was a casual relationship at best. Even though they were in the same law school class and worked together on the Northwestern Law Review ***, the relationship was nothing more than former classmates." Over the 28 years since their graduation, the State's Attorney and Kosin saw each other on only two occasions. One was by mere chance when their sons graduated from the same high school. The other occasion was when Kosin's law firm hosted a breakfast reception for the State's Attorney when he was running for office. The firm's political action committee contributed to the State's Attorney's campaign. However, there is no indication that Kosin personally contributed to the campaign or raised funds or otherwise campaigned for the State's Attorney.

The trial court further found that Kosin correctly answered the questions asked of him by his juror card and the trial court during *voir dire*. According to the court, Kosin's failure to name the State's Attorney as a "member of his immediate family or a close personal friend" was "certainly appropriate since the relationship, if there was one, was remote in time and nature." The court found that Kosin was not required to disclose this law school acquaintance because he did not consider the State's Attorney to be a personal friend. Also, the court found no evidence that Kosin attempted to hide or understate this relationship, either during *voir dire*, or in his testimony at the evidentiary hearing.

Further, the court made the following findings regarding defendant's trial. The "Defense would not have been entitled to a challenge for cause because of the remoteness of the relationship and *** Defendant's right to a peremptory challenge was not adversely affected." Kosin "took his duty as a juror very seriously and *** he and the other jurors agonized over their decision to impose the death penalty. The decision on guilt as well as the death penalty was based only on the evidence as presented in Court in this case." The court found "no evidence to indicate that this remote acquaintanceship with State's Attorney Devine in any way prejudiced Defendant's right to a fair trial."

Of course, the right to a jury trial guarantees to a criminal defendant a fair trial by a panel of impartial jurors. Impartiality is not a technical concept. Rather, impartiality is a state of mind, or a mental attitude. The trial court must ascertain a venireperson's state of mind from the entire *voir dire* examination, giving the venireperson's statements the weight to which they are entitled under the circumstances. A person is not competent to sit as a juror if that person's state of mind or mental attitude is such that, with him or her as a member of the

jury, the defendant will not receive a fair and impartial trial. *People v. Peeples*, 155 Ill. 2d 422, 462-63 (1993) (collecting cases); *People v. Cole*, 54 Ill. 2d 401, 411, 413-15 (1973).

The burden of showing that a venireperson possesses a disqualifying state of mind is on the party making the challenge. The trial court must determine the juror's disqualifying state of mind based on the evidence; mere suspicion of bias is not evidence. The determination of whether or not the venireperson has the state of mind that will enable him or her to give to a defendant a fair and impartial trial rests in the sound discretion of the trial court. *Peeples*, 155 Ill. 2d at 463. "Because the trial court is in a superior position to observe the venireperson's demeanor and evaluate the candor of the responses, the trial court's determination will not be set aside on review unless it is against the manifest weight of the evidence." *People v. Pasch*, 152 Ill. 2d 133, 168 (1992); accord *Peeples*, 155 Ill. 2d at 463; *Cole*, 54 Ill. 2d at 414-15.

In this case, Kosin and trial defense counsel testified at the evidentiary hearing and were subject to cross-examination. The trial court had the opportunity to observe their demeanor and evaluate their candor. The evidence amply supports the court's thorough findings. Based on the evidence, the trial court determined that Kosin's service on the jury did not deny defendant a fair and impartial trial. We cannot say that this determination is against the manifest weight of the evidence.

## II. Admission of Victims' Photographs

Defendant next contends that the trial court erred in admitting into evidence photographs of the victims' burned bodies. The challenged photographs include morgue photographs of six victim's heads, two photographs of the body of a young child, and a photograph of two other bodies. Defendant also objects to the admission

of a portion of a videotape of the building after the fire, which shows full-length and close-up views of three bodies.

Defendant contends that the admission of these exhibits prejudiced his right to a fair trial. He argues that they were so "gruesome" as to horrify the jurors and inflame their passions against him.

Although defendant's trial counsel repeatedly objected to the admission of these exhibits at trial, defendant concedes that his trial counsel failed to include this issue in defendant's post-trial motion. Thus, the issue is waived. *People v. Young*, 128 Ill. 2d 1, 38-40 (1989); *People v. Enoch*, 122 Ill. 2d 176, 186 (1988).

Defendant further asks us to consider this issue under the plain error doctrine of Supreme Court Rule 615(a) (134 Ill. 2d R. 615(a)). Plain error is a limited and narrow exception to the general waiver rule, to be invoked only where the evidence is closely balanced, or the alleged error is so substantial that it deprived the defendant of a fair trial. *People v. Hampton*, 149 Ill. 2d 71, 100 (1992).

The plain error exception to the waiver rule does not save this issue. First, the evidence was not closely balanced. The evidence of defendant's guilt, which includes his confession, is overwhelming. We note that defendant does not now contend that the evidence was insufficient to prove his guilt beyond a reasonable doubt. See *People v. Jackson*, 84 Ill. 2d 350, 360 (1981).

Further, this alleged error was not so substantial that it deprived defendant of a fair trial. "This second prong of the plain error exception is to be invoked only where the possible error is so serious that its consideration is 'necessary to preserve the integrity and reputation of the judicial process.' " *Hampton*, 149 Ill. 2d at 102, quoting *People v. Herrett*, 137 Ill. 2d 195, 214 (1990). After reviewing the challenged exhibits, we conclude that their allegedly erroneous admission is not of such a character.

### III. Improper Closing Argument: Guilt Phase

Defendant next contends that he was denied a fair trial because the State's emotional closing argument distracted the jurors from the relevant issues and aroused the passions and prejudices of the jury against him. Particularly, defendant objects to the State's argument regarding what the conditions in the apartments must have been like and what the victims were doing when defendant set the fire. Defendant argues that the State should not have focused on the "terror and agony" suffered by the victims or on the "heroism and bravery" displayed by the firefighters.

However, the record shows that defendant's trial counsel objected to only one of the many comments to which defendant now objects, and failed to raise this issue in defendant's post-trial motion. The issue is, therefore, waived. *Enoch*, 122 Ill. 2d at 186; *Jackson*, 84 Ill. 2d at 358-59.

Defendant invokes the plain error exception to the waiver rule. A reviewing court would normally consider waived any error related to comments to which no objections were made, unless the comments were so inflammatory that the defendant could not have received a fair trial or so flagrant as to threaten deterioration of the judicial process. *People v. Jones*, 123 Ill. 2d 387, 410 (1988); *People v. Owens*, 102 Ill. 2d 88, 104 (1984). Considered in the context of the State's entire closing argument, the challenged comments did not deny defendant a fair trial or threaten deterioration of the judicial process. Consequently, we find no plain error to excuse the procedural default of defendant's trial counsel.

Defendant alternatively asserts that he was denied the effective assistance of counsel when his trial counsel failed to preserve this issue for review. To demonstrate ineffective assistance of counsel, a defendant must show that: (1) the attorney's performance fell below an objective standard of reasonableness, and (2) the attorney's

deficient performance prejudiced the defendant. Because the defendant must satisfy both prongs of this test, the failure to establish either is fatal to the claim. *Strickland v. Washington*, 466 U.S. 668, 687, 697, 80 L. Ed. 2d 674, 693, 699, 104 S. Ct. 2052, 2064, 2069 (1984).

In this case, we can dispose of defendant's assertion of ineffective assistance of counsel on the "prejudice" prong alone. The trial court would have rightfully overruled any defense objection to the State's remarks because they were based on the evidence and reasonable inferences therefrom. Consequently, had defense counsel objected, the result would have been no different than the effect of his failure to object. This purported ineffective assistance of his trial counsel did not prejudice defendant. See, *e.g.*, *People v. Shaw*, 186 Ill. 2d 301, 332 (1998).

## IV. Multiple Convictions

Defendant makes two assertions regarding his convictions. First, defendant correctly contends that the trial court erred in entering judgment on both knowing and felony murder (720 ILCS 5/9—1(a)(2), (a)(3) (West 1994)) as to each victim. The State confesses error. Where but one person has been murdered, there can be but one conviction of murder. When multiple murder convictions have been entered for the same act, only the conviction for the most culpable charge of murder will be upheld, and the convictions on the less culpable charges of murder must be vacated. *People v. Cardona*, 158 Ill. 2d 403, 411 (1994); *People v. Pitsonbarger*, 142 Ill. 2d 353, 377-78 (1990). Accordingly, we vacate defendant's convictions of felony murder.

Second, invoking the one act, one crime doctrine of *People v. King*, 66 Ill. 2d 551, 566 (1977), defendant contends that his aggravated arson conviction must be vacated. Under *King*, multiple convictions are improper if they are based on precisely the same physical act. *People*

*v. Rodriguez*, 169 Ill. 2d 183, 186 (1996) (and cases cited therein). Here, defendant argues that his aggravated arson conviction is based precisely on the same physical act on which his murder convictions are based, *i.e.*, setting the fire.

We disagree. The State named as aggravated arson victims persons other than the murder victims. It is well settled that separate victims require separate convictions. *People v. Shum*, 117 Ill. 2d 317, 363 (1987). Therefore, defendant's conviction of aggravated arson must stand.

### V. Eligibility Hearing: Double Enhancement

In a somewhat related contention, defendant next asserts that his death sentence must be vacated because the offense of aggravated arson was used as a double enhancement. Defendant's murder convictions rest upon the facts that he set the fire and that, when he did so, he knew that his acts created a strong probability of death or great bodily harm to the victims. See 720 ILCS 5/9—1(a)(2) (West 1994). The only death-eligibility factor on which the State relied was that the victims were "killed in the course of another felony," namely, aggravated arson. See 720 ILCS 5/9—1(b)(6) (West 1994). Defendant argues that he committed only a single act, *i.e.*, setting the fire, which is the basis of both his murder convictions and the death-eligibility factor of aggravated arson. Therefore, according to defendant, we must vacate his death sentence.

This court stated in *People v. Rissley*, 165 Ill. 2d 364, 390 (1995):

"It is a general rule of construction regarding criminal sentencing schemes that a factor implicit in the offense for which defendant is convicted cannot be used as an aggravating factor at sentencing. [Citation.] This double-enhancement rule is premised on the assumption that the legislature considered the factors inherent in the offense in

determining the appropriate range of penalties for that offense."

However, we cannot accept defendant's argument. As this court explained in *Rissley*, 165 Ill. 2d at 392:

"The assumption that the legislature did not intend a more severe penalty based on factors inherent in the offense simply does not apply to the very practice of predicating death penalty eligibility on murders that occur during certain felonies. Such an assumption is inconsistent with the apparent rationale underlying section 9—1(b)(6) 'to deter further acts of violence during the commission of those felonies.' [Citation.] Moreover, accepting defendant's argument would eliminate the very practice of basing death penalty determinations on the commission of a murder in the course of another felony. This is clearly contrary to the intent of the legislature."

We find no double-enhancement violation.

VI. Improper Closing Argument: Eligibility Phase

During the State's rebuttal closing argument at the eligibility hearing, the State repeatedly argued to the jury that, by finding defendant guilty of murder, it had already determined that he was eligible for the death penalty. Defendant contends that this argument misstated the law.

Defendant notes as follows. The jury was instructed on both knowing and felony murder (720 ILCS 5/9—1(a)(2), (a)(3) (West 1994)) and returned seven general verdicts of guilty of first degree murder. Also, the death-eligibility factor found at section 9—1(b)(6) of the Criminal Code of 1961, *i.e.*, the murder was committed in the course of another felony, requires a mental state: that a defendant intended to kill or knew that his acts created a strong probability of death or great bodily harm. 720 ILCS 5/9—1(b)(6)(b) (West 1994). Defendant reasons that if the jury's guilty verdict was based only on felony murder, then the jury, at the eligibility phase, would have to find beyond a reasonable doubt the requisite mental state

of section 9—1(b)(6). Therefore, according to defendant, the State's argument that the jury's general verdicts of guilty had already determined his death eligibility was erroneous and prejudicial.

However, the record shows that defendant's trial counsel failed to object to these remarks. Therefore, the issue is waived. *People v. Barrow*, 133 Ill. 2d 226, 275-76 (1989); *People v. Davis*, 95 Ill. 2d 1, 36 (1983).

Defendant invokes—we note without any supporting argument—the plain error exception to the waiver rule. After reviewing the record, we conclude that the State's remarks were not such that defendant could not have received a fair death eligibility hearing or so flagrant as to threaten deterioration of the judicial process. See *Jones*, 123 Ill. 2d at 410. The jury's written instructions and death-eligibility verdict form contained a full and correct statement of the intent requirement of this death-eligibility factor. Accordingly, the State's purportedly erroneous argument did not amount to plain error. See *People v. Herrett*, 137 Ill. 2d 195, 214-15 (1990); *People v. Carlson*, 79 Ill. 2d 564, 576-77 (1980).

Defendant alternatively contends—again, we note, without any supporting argument—that he was denied the effective assistance of counsel when his trial counsel failed to preserve this issue for review. We disagree. The jury was correctly instructed on the intent requirement of section 9—1(b)(6). Consequently, had defense counsel objected, the result would have been no different from the effect of his failure to object. Thus, defendant was not prejudiced in terms of *Strickland*. See, *e.g., Shaw*, 186 Ill. 2d at 332.

## VII. Death-Eligibility Verdict Form

Defendant next contends that the death-eligibility verdict returned by the jury did not include an affirmative finding that the victims were actually killed by defendant.

The eligibility factor relied upon by the State required the State to prove that: (1) the murdered individuals were killed during the course of another felony; (2) the murdered individuals were actually killed by defendant; (3) in performing the acts which caused the deaths, defendant acted with the intent to kill the murdered individuals or with the knowledge that his acts created a strong probability of death or great bodily harm to the murdered individual or another; and (4) the other felony was aggravated arson. See 720 ILCS 5/9—1(b)(6) (West 1994).

The verdict form returned by the jury states in relevant part:

"We the jury, unanimously find beyond a reasonable doubt that the defendant, Julius Kuntu, is eligible for a death sentence under the law. We unanimously find beyond a reasonable doubt that:

\* \* \*

the following statutory aggravating factor exists:

The murdered persons were killed in the course of another felony if the murdered persons were actually killed by the defendant; and

in performing the acts which caused the death of the murdered persons, the defendant with the intent to kill the murdered persons or with the knowledge that his acts created a strong probability of death or great bodily harm to the murdered persons or another; and

the other felony was aggravated arson."

Defendant acknowledges that the verdict form contains the language found in section 9—1(b)(6). However, he argues that the verdict form is improper because, while it contains the phrase "the murdered persons were actually killed by the defendant," it does so only as a conditional observation and not as an affirmative finding by the jury.

The record shows that defendant's trial counsel neither objected to this verdict form nor included this issue

in defendant's post-sentencing motion. Therefore, we normally would consider this issue to be waived. *People v. Jackson*, 182 Ill. 2d 30, 68-69 (1998); *People v. Easley*, 148 Ill. 2d 281, 337 (1992). However, the State does not argue before this court that defendant has waived this issue. Accordingly, we now deem the State to have waived any objection to our consideration of the merits of this issue. See *People v. Williams*, 193 Ill. 2d 306, 347-48 (2000); *In re Splett*, 143 Ill. 2d 225, 235 (1991).

If a verdict purports to set out, as specific findings, the elements of the offense, "it must do so completely or be held insufficient." *People v. Mack*, 167 Ill. 2d 525, 538 (1995). For example, in *Mack*, this court held that a verdict form was improper when it purported to set out the elements found in section 9—1(b)(6) but failed to include the requisite mental state of intent or knowledge. *Mack*, 167 Ill. 2d at 538. Defendant contends that the problem is not that the element is missing, but that it is phrased in such a way that the jury need not make the finding that it exists.

We disagree. The verdict form contains all of the findings required by section 9—1(b)(6).

Importantly, *Mack* does not require that the verdict form follow any particular format, nor does it require the verdict form to use the exact statutory language. While such actions may be the most efficient way of ensuring that the verdict form accurately states the law, that is not what is required. All that *Mack* requires is that, if the verdict form purports to set out the elements, it must contain a finding as to each element. *Mack*, 167 Ill. 2d at 538.

Defendant's concern is that the verdict form does not include an affirmative finding that he actually killed the murdered persons. However, after reviewing the verdict form in its entirety, we are convinced that it contains such a finding. The introductory phrase to the mental

state element states: "in performing the acts which caused the death of the murdered persons, the defendant ***." Clearly, this is an affirmative finding that defendant actually killed the murdered individuals. Defendant's argument must fail.

### VIII. Failure to Investigate: Defendant's Treating Psychiatrist

Defendant next contends that he was denied the effective assistance of counsel at the death sentencing hearing when his attorney failed to discover the existence of and present the testimony of defendant's treating psychiatrist. Although the psychiatrist, Dr. Luckose Luke, failed to testify at the death sentencing hearing, he did testify at a post-sentencing hearing.

To support a claim of ineffective assistance of counsel, a defendant must allege facts to demonstrate that the attorney's representation fell below an objective standard of reasonableness, and that there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. *Strickland*, 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068. Regarding the prejudice prong of *Strickland*, in the context of a death sentencing hearing, a defendant must prove that there is a reasonable probability that, absent counsel's deficient conduct, the sentencer would have concluded that the balance of aggravating and mitigating circumstances did not warrant death. *People v. Easley*, 192 Ill. 2d 307, 338 (2000).

In this case, we can dispose of defendant's assertion of ineffective assistance of counsel on the "prejudice" prong alone. Defendant must show that he has suffered prejudice, *i.e.*, that, but for defense counsel's failure, a reasonable probability exists that the sentencer would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.

Defendant argues that this prejudice is shown by the

fact that his treating psychiatrist, Dr. Luke, would have corroborated the testimony of defendant's expert, Theophilus Green, that defendant suffered from a mental and emotional disturbance that required a regimen of antipsychotic medications. Moreover, defendant asserts that Dr. Luke's testimony would have contradicted the testimony of the State's experts that defendant was a malingerer. Defendant also argues that Dr. Luke's testimony, which would have revealed a diagnosis similar to Dr. Green's, would have rebutted the State's argument that Dr. Green testified in defendant's favor only because defendant paid him to do so.

The State counters by asserting that Dr. Luke's testimony would not have rebutted the evidence provided by the State experts and that, in fact, it would have partially supported the testimony of the State's experts. As the State explains, Dr. Luke's testimony would have revealed that Dr. Luke had performed no psychological evaluation on defendant and that he never reviewed any psychological evaluation that had been performed on defendant. Further, although Dr. Luke was monitoring defendant's ingestion of psychotropic medication, Dr. Luke did not diagnose defendant and did not originally prescribe defendant's medication. Dr. Luke had once reduced defendant's medication and then returned it to the previous level when defendant's symptoms returned. However, Dr. Luke's basis for this decision, and, indeed, his entire opinion as to defendant's mental condition, was based solely upon defendant's own description of his symptoms and was not based upon any objective tests or criteria. Further, Dr. Luke would have testified that his monitoring of defendant's condition consisted of a meeting held once per month and lasting only 15 to 20 minutes.

As for the State's experts, Drs. Paul Fauteck and Roni Seltzberg each opined in their testimony that defendant

was malingering. In addition to his above-recounted testimony, Dr. Fauteck testified as follows. Defendant's school records indicated that defendant has an IQ of around 80, which is 11 points higher than he scored during Dr. Fauteck's examination, and 22 points higher than he scored during Green's examination. Dr. Fauteck also believed that defendant's claims of auditory and visual hallucinations were not credible. Dr. Fauteck opined that, if defendant had suffered auditory hallucinations for as long as defendant claims, defendant's schizophrenia would be so severe that, by the time he reached his twenties, he would be "a virtual vegetable, severely deteriorated, unable to communicate." Dr. Fauteck found defendant's claims of visual hallucinations to be equally not credible, because defendant showed no other signs of the formal thought disorder that accompanies such hallucinations.

After reviewing the evidence presented, we are unable to conclude that a reasonable probability exists that, had defense counsel presented Dr. Luke's testimony, the jury would not have voted to impose the death penalty. Importantly, we agree with the State's interpretation of Dr. Luke's testimony. His testimony regarding defendant's mental condition was based entirely on defendant's own descriptions of his symptoms. If the jury believed Drs. Fauteck and Seltzberg that defendant was malingering, nothing that Dr. Luke has revealed would have given the jury any reason to discount the opinions of the State's experts. Conversely, if the jury already believed Green's testimony, Dr. Luke's testimony would have added nothing significant to Green's testimony. Accordingly, we must reject defendant's argument.

IX. Improper Closing Argument: Penalty Phase

Defendant next contends that the State deprived him of a fair and reliable death sentencing hearing at its penalty phase when, during closing argument, the State:

(1) improperly described an inherently mitigating factor as an aggravating factor; (2) argued that if the jurors failed to impose the death penalty they would be giving defendant "five murders for free"; (3) materially misstated the evidence in arguing that defendant had schemed to obtain a lower IQ score on a later test; and (4) improperly argued that, because defendant was not mentally retarded, evidence of his low IQ scores was not mitigating.

The record shows that defendant's trial counsel failed to include this issue in defendant's post-sentencing motion. The issue is, therefore, waived. *People v. Hall*, 195 Ill. 2d 1, 26 (2000).

Defendant invokes the plain error rule. We conclude that two of the challenged remarks constituted plain error.

The dissent concludes that we should not excuse defendant's procedural default of these issues because they do not constitute plain error. The dissent cautions against the "nonchalant" application of the plain error rule. The dissent contends that the evidence presented at the penalty phase of the death sentencing hearing was not closely balanced, and the prosecutorial remarks were not of such magnitude as to deprive defendant of a fair death penalty hearing. 196 Ill. 2d at 150 (Fitzgerald, J., dissenting).

We disagree. The evidence at the penalty phase of the death sentencing hearing was closely balanced. The State relied upon only the facts and circumstances of the crime and introduced no additional evidence in aggravation. Defendant, however, introduced substantial evidence in mitigation regarding his background and mental condition, including evidence that he had never before been convicted of a crime. 196 Ill. 2d at 121. Because the evidence is closely balanced, there is a possibility that defendant may have been sentenced to death due to some

error which is obvious from the record, but not properly preserved for review. See *People v. Carlson*, 79 Ill. 2d 564, 576 (1980). To prevent such a serious miscarriage of justice, we consider the error. See *People v. Green*, 74 Ill. 2d 444, 454 (1979) (Ryan, J., specially concurring). For the reasons that follow, we conclude that each of the challenged remarks, individually, warrants the reversal of defendant's death sentence.

## A. *Defendant's Lack of Criminal History*

During defendant's closing argument, defense counsel informed the jury that the legislature recognized as a mitigating factor the fact that defendant does not have a criminal history. In rebuttal, a trial prosecutor argued:

> "When you really think about it what [defense] counsel has argued is a lack of criminal background. I suggest to you that in this particular case, you can consider that as aggravation because you know what it tells you. It tells you that up until age 26—
>
> [Defense counsel]: Objection.
>
> THE COURT: Overruled.
>
> [Prosecutor]: It tells you that up until Age 26 this guy knew the difference between right [*sic*]. He knew the difference between right and wrong. He knew the difference between good and evil."

Defendant argues that the legislature has decided that the lack of a significant criminal history is a mitigating factor (see 720 ILCS 5/9—1(c)(1) (West 1994)) and that a trial prosecutor lacks the authority to change that legislative determination. In response, the State argues that, when the comment is viewed in context, the trial prosecutor was not really arguing that defendant's lack of a criminal history is a reason to sentence him to death but, rather, the fact that defendant had not previously been convicted of a crime showed that he knew right from wrong and that, in this instance, he consciously chose the evil action. The State further contends that this is particularly relevant here because defendant argued that

his diminished intellectual capacity was a basis for not imposing the death penalty.

We agree with the State that defendant's intellectual capacity was a significant question to be considered at the death sentencing hearing. However, this is not what the trial prosecutor argued.

The State asserts that the trial prosecutor was not arguing that defendant's lack of a criminal history is a reason to sentence him to death. The dissent accepts this view of the prosecutor's remark. 196 Ill. 2d at 151-53 (Fitzgerald, J., dissenting). This argument is simply untenable. Defendant's trial counsel argued that the jury should consider defendant's lack of criminal history as a mitigating factor. In rebuttal, the trial prosecutor specifically told the jury: "you can consider that [defendant's lack of criminal history] as aggravation." Subsequently, the jury was properly instructed that: "Aggravating factors are reasons why the defendant should be sentenced to death. Aggravating factors include *** Any other reason supported by the evidence why the defendant should be sentenced to death." See Illinois Pattern Jury Instructions, Criminal, No. 7C.06 (3d ed. 1992). Clearly, by her choice of words, the trial prosecutor was arguing to the jury that defendant's lack of criminal history was a reason to sentence him to death.

We turn now to the question of whether the State's argument was proper. If a state wishes to impose the death penalty, it must have a statutory scheme that channels the sentencer's discretion by clear and objective standards that provide specific and detailed guidance and that make the process for imposing a death sentence rationally reviewable. *Godfrey v. Georgia*, 446 U.S. 420, 428, 64 L. Ed. 2d 398, 406, 100 S. Ct. 1759, 1764-65 (1980). Here, the legislature has chosen to "channel the sentencer's discretion" by defining specific aggravating factors that justify the imposition of the death penalty.

720 ILCS 5/9—1(b) (West 1994). Moreover, the legislature has further channeled this discretion by identifying five specific mitigating factors that demonstrate why a defendant should not be sentenced to death. 720 ILCS 5/9—1(c) (West 1994). In considering the constitutionality of our death penalty statute, this court has held that the statute provides "precisely the kind of capital sentencing procedure approved by the Supreme Court; this procedure both prevents the arbitrary imposition of the death penalty by specifying the class of murderers who are eligible for the death penalty, and provides for consideration of mitigating factors unique to the offense and offender." *People v. Bean*, 137 Ill. 2d 65, 139 (1990).

The legislature has chosen a specific scheme to ensure that the death penalty is not applied in an arbitrary and capricious manner. As part of this legislative scheme, the legislature has defined certain facts as inherently mitigating. One of these is that "the defendant has no significant history of prior criminal activity," which, we note, the jury was told in its written instructions. See 720 ILCS 5/9—1(c)(1) (West 1994). Thus, the legislature has determined that, if a defendant lacks a criminal history, that is a fact that weighs in favor of a defendant's not being sentenced to death. This does not mean that, if the factor exists, the defendant should not be sentenced to death. The sentencer is vested with the discretion to determine what weight to assign that fact and may, if it chooses, place little or no weight on that factor. However, neither this court nor a trial prosecutor has the authority to change the legislative scheme and convert a fact that the legislature has determined to weigh in favor of not sentencing a defendant to death into a fact that weighs in favor of sentencing a defendant to death.

This does not mean that other legitimate inferences cannot be drawn from the same fact. We have previously recognized that the State may argue that a defendant's

evidence of a mitigating factor does not fit within the statutory definition of that factor and, therefore, the jury may consider that factor as aggravating rather than mitigating. See *People v. Macri*, 185 Ill. 2d 1, 66-67 (1998); *People v. McNeal*, 175 Ill. 2d 335, 368 (1997). Moreover, this court has held that, when the defendant presents nonstatutory mitigating factors, the State need not agree with the defendant's characterization of the factors as mitigating and may even argue that the factors are aggravating. See *People v. Hudson*, 157 Ill. 2d 401, 454 (1993); *People v. Page*, 155 Ill. 2d 232, 279 (1993). We cannot countenance, however, an argument that admits that the facts meet the statutory definition of a mitigating factor, but argues that, regardless of this legislative determination, the jury should consider the factor to be aggravating.

Here, the trial prosecutor argued that the jury should employ the factor in a manner directly opposite to the way in which the legislature intended. Such an argument is clearly improper and prejudicial. The jury was instructed in writing that defendant's lack of a prior criminal history is a mitigating factor. However, the jury was also instructed in writing that aggravating factors include any other reason supported by the evidence why defendant should be sentenced to death. The prosecutor argued to the jury that one such reason was the identical factor that the jury was instructed was mitigating, *i.e.*, defendant's lack of a prior criminal history. Sentencing jurors cannot be expected to engage in a meaningful process of weighing aggravation and mitigation when they are given such irreconcilable directions. Such a misstatement of the law in closing argument is improper, particularly where, as here, the legal principle misstated is a critical one in the case. See *People v. Holman*, 103 Ill. 2d 133, 170 (1984).

After reviewing the entire closing argument, we

conclude that these improper remarks by the State were so inflammatory that defendant could not have received a fair sentencing hearing, or were so flagrant as to threaten deterioration of the judicial process and necessitates the vacatur of defendant's death sentence. See *People v. Sims*, 192 Ill. 2d 592, 637 (2000).

### B. *"Five Free Murders"*

Defendant also asserts that he was deprived of a fair death sentencing hearing when the trial prosecutors argued that, if the jury voted not to impose the death penalty, they would be giving defendant five free murders. We agree.

During the State's opening argument, a trial prosecutor argued:

"If you do not sentence him to death he will be sentenced to life in prison without parole, unless, of course, some governor down the road grants an order of executive clemency.

Life without parole is the minimum sentence in this case. He does not deserve the minimum sentence for killing four children and three adults.

The law in Illinois is that if you kill two people you go to jail for life without parole. He killed seven people. *If you do not sentence him to death that will be giving him five freebies.*

Which five ladies and gentlemen? The Frausto family? The five who are above the age of five? Which five?

The minimum sentence would be like grounding him, sending him to his room. It will be like he has beaten the system. He will get down there and they will say, oh, there goes Julius Kuntu. *He got five free dead people."* (Emphases added.)

During the State's rebuttal argument, the other trial prosecutor argued:

"You must determine is this defendant deserving of the minimum sentence or the death penalty.

What are the lives of all of these victims worth? What did defendant's actions demonstrate? *Does he get five*

*murders for free*, because that is what he is looking for. He's looking for the sale of the year here, just like he always has from the date that he has gotten caught." (Emphasis added.)

Defendant asserts that the State committed misconduct when it argued that not sentencing defendant to death would be like giving him five free murders.

We find error in allowing the State to argue to the jury that, if it should fail to vote to sentence defendant to death, the jury will be giving defendant five free murders. Contrary to the view of the dissent (see 196 Ill. 2d at 155 (Fitzgerald, J., dissenting)), this is neither an accurate statement of the law nor a reasonable inference from the evidence. Rather, it is simply an inflammatory statement with no basis in either law or fact; it is tantamount to the conclusion that, as a matter of law, a person who kills more than two persons should be sentenced to death.

This is not to say that the State may not rely on the severity of the crime or the number of victims to argue that the death penalty should be imposed. What the State may not do is argue that, because two murders result in a minimum sentence of life imprisonment, a defendant who commits more than two must be sentenced to death or be deemed to have received one or more "freebies," "free dead people," or "murders for free." These fundamental principles must be remembered:

"It is of vital importance to society and to the defendant that any decision to impose the death penalty is, and appears to be, based upon reason rather than emotion. [Citation.] Because of the qualitative difference between a sentence of death and other forms of punishment, a high standard of procedural accuracy is required in a hearing to determine whether the death penalty will be imposed [citation]. The focus in death penalty hearings must be on the particular nature of and the circumstances surrounding the offense, and the individual character and record of the defendant. [Citation.] It is axiomatic that parties in closing

argument may not go beyond the scope of the evidence presented and facts fairly inferable therefrom [citation], misstate the law [citation], or express their personal opinions on the evidence [citation] or on defendant's guilt [citation]. Further, arguments which are calculated to play upon the jurors' emotions are clearly improper. A penalty of death that may have been imposed under the influence of passion or prejudice cannot stand." *People v. Williams*, 161 Ill. 2d 1, 77-78 (1994).

For this reason, we conclude that the remarks constitute plain error and are of a nature to warrant reversal of defendant's death sentence.

The dissent asserts that "[t]he State's comments were clearly indelicate. They were not, however, so flagrant as to threaten the judicial process." 196 Ill. 2d at 156 (Fitzgerald, J., dissenting). We disagree. The remarks of the trial prosecutors clearly appealed to the passions of the jury. "A penalty of death that could have been imposed under the influence of passion or prejudice cannot stand." *People v. Szabo*, 94 Ill. 2d 327, 367 (1983).

Also, the dissent notes that "the jury was properly admonished about the law in Illinois and would have correctly understood the remarks not as statements of law but as comments on the evidence." 196 Ill. 2d at 156 (Fitzgerald, J., dissenting). We disagree. Instructing the jury that arguments are not evidence will not, in every instance, cure the defect caused by the remarks. Whether the remarks constitute error depends, in each case, on the nature and extent of the statements. *People v. Blue*, 189 Ill. 2d 99, 132 (2000). In this case, "we find that the generic instructions tendered by the State were not likely to undo the damage to defendant's case inflicted by the State's pointed remarks." *Blue*, 189 Ill. 2d at 132. In light of the closely balanced evidence presented at the penalty phase of the death sentencing hearing, the risk is simply too great that the prosecutor's comments improperly influenced the jury's sentencing decision.

Because we conclude that defendant is entitled to a

new death sentencing hearing, we consider the remaining challenged remarks to the extent that they are likely to arise again. See, *e.g.*, *People v. Johnson*, 159 Ill. 2d 97, 135 (1994); *People v. Gacho*, 122 Ill. 2d 221, 260 (1988).

## C. *Misstatement of IQ Evidence*

Defendant contends that the State materially misstated the evidence in arguing that he had schemed to obtain a lower IQ score on a later test. As we earlier stated, Green administered an IQ test to defendant, on which he scored 58. Dr. Fauteck subsequently administered the test to defendant, on which he scored 69. The State now concedes that it misstated the evidence when it argued that defendant obtained a lower score on the subsequent test. We are confident that this misstatement will not recur at defendant's new sentencing hearing.

## D. *IQ Evidence As Not Mitigating*

Defendant contends that the State improperly argued that, because he was not mentally retarded, evidence of his low IQ score was not mitigating. It is true that a low IQ score can be considered as mitigating evidence. *People v. Perez*, 148 Ill. 2d 168, 187 (1992). However, a low IQ score is not a statutory mitigating factor. Thus, the State is free to argue that this mitigating evidence is not sufficient to preclude the imposition of the death penalty, or even that this evidence is not mitigating evidence at all. *People v. Page*, 155 Ill. 2d 232, 279 (1993).

## X. Remaining Issues

In light of our decision to reverse defendant's death sentence, we need not address defendant's remaining contentions. See, *e.g.*, *Shaw*, 186 Ill. 2d at 358; *People v. Holman*, 103 Ill. 2d 133, 178 (1984).

## CONCLUSION

For the foregoing reasons, we vacate defendant's convictions of felony murder and affirm his remaining

convictions. The sentencing jury's conclusion that defendant is eligible for the death penalty remains standing. Accordingly, if the State seeks the death penalty for defendant on remand, only the second phase of the death sentencing hearing need be conducted anew. See *People v. Thompkins*, 191 Ill. 2d 438, 477 (2000) (and cases cited therein). We reverse defendant's death sentence and remand the cause to the circuit court of Cook County for further proceedings.

*Convictions affirmed in part and*
*vacated in part;*
*death sentence reversed;*
*cause remanded.*

CHIEF JUSTICE HARRISON, specially concurring:

I agree with the majority that Kuntu's convictions should be affirmed in part and vacated in part and that we should vacate his sentence of death. I write separately because I would further hold that the State should not be permitted to seek the death penalty when the matter returns to the circuit court. For the reasons set forth in my partial concurrence and partial dissent in *People v. Bull*, 185 Ill. 2d 179 (1998), the Illinois death penalty law violates the eighth and fourteenth amendments to the United States Constitution (U.S. Const., amends. VIII, XIV) and article I, section 2, of the Illinois Constitution (Ill. Const. 1970, art. I, § 2). It is therefore void and unenforceable.

Because the death penalty law is unconstitutional, Kuntu must now be sentenced to a term of imprisonment. 720 ILCS 5/9—1(j) (West 1994). Because he was convicted of murdering more than one victim, the term of his imprisonment must be natural life. 730 ILCS 5/5—8—1(a)(1)(c)(ii) (West 1994).

JUSTICE FITZGERALD, dissenting:

I agree with the majority in this case that defendant's

convictions should be affirmed in part and vacated in part. This dissent is directed only to that portion of the majority's opinion that resolves the issue of the State's closing argument during the penalty phase of defendant's sentencing hearing. Defendant failed to properly preserve this issue for appeal. The majority, however, chooses to review this issue pursuant to the plain error rule. 134 Ill. 2d R. 615(a). The majority concludes that two of the State's remarks during closing argument, independent of each other, would warrant the reversal of defendant's death sentence. I disagree with both the plain error analysis and the resolution of the substantive issues as to each of the challenged remarks.

Before plain error can be considered as a means of circumventing the general waiver rule, it must be plainly apparent from the record that an error affecting substantial rights was committed. *People v. Munson*, 171 Ill. 2d 158, 196 (1996), citing *People v. Precup*, 73 Ill. 2d 7, 17 (1978). Even then, the plain error rule does not mandate review of all errors affecting substantial rights. *People v. Pickett*, 54 Ill. 2d 280, 282 (1973). Although Supreme Court Rule 615(a) states that notice may be taken of "[a]ny error, defect, irregularity, or variance" which affects "substantial rights" even though such error was not brought to the attention of the trial court at the time of trial, this rule is not without limitations. 134 Ill. 2d R. 615(a); see also *People v. Pickett*, 54 Ill. 2d 280, 282 (1973); *People v. Keene*, 169 Ill. 2d 1, 16 (1995). Typical trial mistakes are not marked by "fundamental unfairness." Rather, fundamental unfairness occurs in situations that reveal a breakdown in the integrity of our judicial process. *Keene*, 169 Ill. 2d at 17. Thus, we may review an unpreserved error only in two situations: (1) where the evidence is closely balanced or (2) where the error is of such magnitude that it denies the accused of a fair and impartial trial or sentencing hearing. *Keene*, 169 Ill. 2d at 18.

This case presents an inappropriate circumstance in which to relax the waiver rule and consider the issues on the merits. See *People v. Hamilton*, 179 Ill. 2d 319 (1997). I agree with Justice Freeman's special concurrence in *People v. Kuntu*, 188 Ill. 2d 157, 164 (1999) (Freeman, C.J., specially concurring, joined by McMorrow, J.) (*Kuntu I*) where he cautioned against the "nonchalant invocation of our plain error rule." Justice Freeman noted that neither "Rule 615(a)" nor the term "plain error" has "talisman-like effect" to transform claims which have been otherwise procedurally defaulted into claims which are automatically subject to substantive review. *Kuntu I*, 188 Ill. 2d at 164 (Freeman, C.J., specially concurring, joined by McMorrow, J.); see *People v. Terrell*, 185 Ill. 2d 467, 524 (1998) (Freeman, C.J., specially concurring, joined by McMorrow, J.). Although *Kuntu I* involved the resolution of an issue different from the one before us, the principles of the plain error doctrine enunciated by Justice Freeman should apply with equal force in the present situation.

The plain error rule should not have been invoked in this case because neither of the two situations that allow for the invocation of the rule existed. See *Keene*, 169 Ill. 2d at 18. The evidence presented against defendant during the sentencing phase was substantial and not closely balanced. Absent the State's remarks, the evidence presented was of such a nature that the jury's verdict would have remained the same. Moreover, the State's remarks in closing argument and rebuttal, when taken in context of the entire argument, did not cause a substantial injustice to defendant or reveal a breakdown in the integrity of our judicial process. The remarks were not of such magnitude as to deprive defendant of a fair hearing.

The first challenged remark involves the State's comment during rebuttal argument that the jury could consider defendant's lack of a criminal record to deter-

mine whether defendant knew right from wrong, good from evil. Although the majority acknowledges that defendant's intellectual capacity was a significant question during the death sentencing hearing, it nonetheless finds the State's reference to the word "aggravation" as being improper, prejudicial and so inflammatory that defendant was deprived of a fair sentencing hearing. This conclusion, however, places more emphasis on the terminology than the context in which it was used.

Remarks during closing argument must be reviewed in the context of the closing arguments as a whole. *People v. Macri*, 185 Ill. 2d 1, 62 (1998). Further, during the sentencing hearing, the prosecutor may properly contest the significance and weight of the defendant's mitigating evidence. The State is not required to agree that the evidence offered in mitigation by defendant is indeed mitigating. See *People v. Henderson*, 142 Ill. 2d 258, 338 (1990). Nothing requires the prosecutor to agree with the defendant that the evidence offered in his behalf is sufficiently mitigating to preclude imposition of the death sentence, or that it is even mitigating at all. *People v. Page*, 155 Ill. 2d 232, 279 (1993); see *Eddings v. Oklahoma*, 455 U.S. 104, 114-15, 71 L. Ed. 2d 1, 11, 102 S. Ct. 869, 877 (1982). Just as the sentencer or reviewing court " 'may determine the weight to be given relevant mitigating evidence' [citations], so too may the prosecutor, during the sentencing hearing, contest the significance or weight of the defendant's evidence." *Page*, 155 Ill. 2d at 279; *People v. Bean*, 137 Ill. 2d 65, 124-27 (1990).

Here, the majority focuses on the State's use, during a single isolated instance, of the word "aggravation" in reaching its conclusion. This term, however, when viewed in the context of the entire argument and the issue raised by the defense at the sentencing hearing shows that the State did not argue that defendant's lack of a criminal record was a fact to be considered in aggravation rather

than mitigation. Instead, the State referenced defendant's lack of a criminal record to counter defense counsel's argument that defendant's mental capacity prevented him from appreciating the danger and destruction he caused when he set the building on fire. The State contested the significance and weight of the mitigating factor (the lack of a criminal record) and offered a different interpretation or inference that can be drawn from that factor.

It appears that the majority would agree that if the State had commented on the fact that defendant's lack of a criminal history showed that he knew right from wrong, this comment would have been a proper and fair assessment of the evidence. The majority itself notes that the State can draw legitimate inferences from the same fact as the defense. According to the majority's analysis, however, the State's use of the word "aggravation" when referring to a statutorily designated mitigating factor violated the legislative scheme because it changed a fact the legislature intended to be a mitigating factor into an aggravating factor. It was the use of the word "aggravation," not the content of the argument, that the majority believes made the State's entire closing argument prejudicial and improper.

This conclusion, however, places undue emphasis on the word "aggravation" rather than the overall context in which that word was used. Had the actual word been factored out of the State's argument, the State's inference would have been appropriate in this case. The majority's conclusion that use of the word "aggravation" converted the entire legislative scheme undercuts the fact that the State can draw legitimate inferences from the same fact that the defense uses in mitigation. See *Page*, 155 Ill. 2d at 279 (nothing requires the prosecution to agree with the defendant that the evidence offered in his behalf is sufficiently mitigating to preclude imposi-

tion of the death sentence, or that it is even mitigating at all).

Despite the majority's conclusion to the contrary, the record shows that the State did not argue that defendant's lack of a criminal history transformed a statutorily mitigating factor into an aggravating factor. The mere reference to the word "aggravation" did not convert that portion of the State's argument to a statutorily designated aggravating factor. To assume that it did is both contrary to the record and to logic. In *Page*, this court considered a similar argument as the one raised by the defendant in this case. The State argued, in *Page*, that defendant's mitigation was " 'in the category of aggravation and \*\*\* [n]othing more and nothing less but plain, simple excuses, a cop out.' " *Page*, 155 Ill. 2d at 278. This court concluded that the prosecutor's argument did not restrict or limit the defendant's presentation of mitigating evidence in any way, or misstate to the jurors the applicable law governing their consideration of evidence. *Page*, 155 Ill. 2d at 280. The prosecutor "simply discounted the significance of the defendant's mitigation, urging the jury to reject that evidence as grounds for declining to impose the death sentence." *Page*, 155 Ill. 2d at 280.

Similarly, in *People v. McNeal*, 175 Ill. 2d 335, 370 (1997), this court rejected the defendant's argument that the prosecutor's comment about defendant's antisocial personality disorder is a ''double-edged sword for purposes of mitigation and aggravation.'' The prosecutor stated in *McNeal* that defendant's antisocial personality disorder was an aggravating factor that showed defendant's potential for violence. *McNeal*, 175 Ill. 2d at 368. We concluded that "the prosecutor merely disagreed with the defendant's characterization of that evidence as mitigation, *as he is permitted to do*." (Emphasis added.) *McNeal*, 175 Ill. 2d at 371.

Here, the State's reference to "aggravation" did not inject an extraneous inflammatory or prejudicial consideration before the jury. The State's argument did not distort the aggravation evidence so as to imply that defendant's lack of a criminal record *must* be considered as a factor in aggravation instead of mitigation. Instead, the prosecutor discounted the significance of defendant's lack of a criminal record for mitigation and urged the jury to consider an alternative interpretation of that evidence, as relevant in this case, to show defendant's mental capacity. The State did not suggest that the law did not allow it to consider defendant's lack of a criminal record in mitigation. Moreover, the jury was properly instructed, in writing, that the lack of a criminal record is an inherently mitigating factor that weighs in favor of a defendant not being sentenced to death. It was further instructed that closing arguments are not to be considered as evidence. As such, the State's comment and use of the word "aggravation" in its argument did not convert a legislatively mandated mitigating factor into one that must be considered in aggravation.

The second comment that the majority finds would independently warrant reversal of the death sentence involves the State's inartful comment during opening argument that if the jury failed to impose the death penalty, defendant would be given "five freebies," "five free dead people," "five murders for free." The State argued to the jury that the law in Illinois states that if a person kills two people, that person can be sentenced to life in prison without parole. Because defendant killed seven people, in this case, if the jury sentenced defendant to life, the murder of five of the victims would be unvindicated because defendant would receive the same sentence as a person who killed only two victims. The tenor of the State's argument was that defendant deserved to be punished to the full extent of the law—

death—because of the nature of the crime he committed and the number of deaths that resulted from that crime.

Initially, I point out that defendant did not preserve this issue for review by including it in his post-sentencing motion and the plain error doctrine should not apply in this situation. As discussed above, the evidence introduced at the sentencing hearing was not closely balanced, and, further, the alleged error did not deprive defendant of a fair and impartial sentencing hearing. Thus, the plain error doctrine should not be extended in this case. The State's comments, although questionable, did not rise to the level of error which is so prejudicial as to affect the overall fairness of the sentencing hearing. *People v. Spreitzer*, 123 Ill. 2d 1, 37 (1988).

The State may properly argue to the jury that each of the seven victims can be considered by the jury as a person with a name and a life that had value. See *People v. Fair*, 159 Ill. 2d 51, 94 (1994). The majority, however, construed the State's reference to "five freebies" and "five murders for free" to mean that, as a matter of law, a person who kills more than two persons must automatically be sentenced to death . The State, however, at no time argued that the death penalty should always be imposed when more than two persons are killed. Instead, the State implied, through its comments, that the offense was particularly egregious and especially deserving of the death penalty. The State commented, as it has a right to do, that defendant's crime was an atrocious crime that resulted in the senseless death of seven victims, including the death of four children. Thus, the State's comments, although inartful, were not misstatements of the death penalty law and should not be construed in such a fashion.

Additionally, there is nothing in the record to suggest that the jurors misunderstood the instructions or that they believed that they had to sentence defendant to

death because he killed more than two persons. The State's comments were clearly indelicate. They were not, however, so flagrant as to threaten the judicial process. Notably, the jury was properly admonished about the law in Illinois and would have correctly understood the remarks not as statements of law but as comments on the evidence. Considering the prosecutor's remark in context and against the background of evidence indicating that defendant showed a complete disregard for the men, women and children living in the building at the time he chose to set the building on fire, the State's comment, even if improper, was not so inflammatory as to deny defendant a fair hearing; thus, any error was harmless. See *Edgeston*, 157 Ill. 2d at 241-42. Consequently, I disagree with the majority's conclusion that there is a need to conduct the second phase of the death sentencing hearing anew.

In all other respects, I join in the majority's decision in this case.

JUSTICES THOMAS and GARMAN join in this dissent.